THEODORE B. STOLMAN (BAR NO. 52099)
ted.stolman@ffslaw.com
CAROL CHOW (BAR NO. 169299)
carol.chow@ffslaw.com
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
Telephone: (310) 255-6100
Facsimile: (310) 255-6200

[Proposed] Attorneys for
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>PS ON TAP, LLC, a California limited liability company, *et al.*,<br><br>　　　Debtors and Debtors in Possession.<br><br>Affects:<br><br>☒ ALL DEBTORS<br>☐ PS ON TAP, LLC, a California limited liability company<br>☐ GRILL CONCEPTS, INC., a California corporation<br>☐ GRILL CONCEPTS, INC., a Nevada corporation<br>☐ GRILL CONCEPTS SERVICES, INC., a California corporation<br>☐ GRILL CONCEPTS MANAGEMENT, INC., a California corporation<br>☐ GCI-MP, INC., a California corporation<br>☐ PS 303, LLC, a Colorado limited liability company<br>☐ SHIFT BAR, LLC, a Nevada limited liability company<br>☐ GCI-CC, INC., a California corporation<br>☐ GRILL CONCEPTS - D.C., Inc., a District of Columbia corporation | Case No. 1:21-bk-10757-MB<br><br>Joint Administration Requested with Case Nos. 2:21-bk-13477-MB; 1:21-bk-10759-MB; 1:21-bk-10760-MB; 1:21-bk-10761-MB; 2:21-bk-13481-MB; 1:21-bk-10762-MB; 1:21-bk-10763-MB; 2:21-bk-13483-MB; and 1:21-bk-10764-MB<br><br>Chapter 11<br><br>**DECLARATION OF CLAUDE R. COGNIAN IN SUPPORT OF THE DEBTORS' FIRST DAY MOTIONS**<br><br>[Filed in support of: 1. *Ex Parte* Motion for Joint Administration; 2. *Ex Parte* Motion to Limit Service of Notice; 3. Emergency Motion to Extend Time to File Case Opening Documents; 4. Emergency Motion to Pay Pre-Petition Wages and Honor Employee Benefits Programs; 5. Emergency Motion to Honor Gift Cards Program, On-Line Delivery Program, and Electronic Payment Program; 6. Emergency Motion to Maintain Bank Accounts and Cash Management System; 7. Emergency Motion re Insurance Premium Finance Agreement; and 8. Emergency Motion to Reject Leases]<br><br><u>Hearing re Emergency Motions</u><br><br>Date:　May 6, 2021<br>Time:　1:30 p.m.<br>Place:　Zoom  [Please refer to Notice of Emergency Hearing] |

4891321.2                                1

I, Claude R. Cognian, declare as follows:

1. I am over eighteen years of age, and I have personal knowledge of each of the facts stated in this declaration. If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

2. I am the President, Chief Executive Officer or the authorized representative of PS On Tap, LLC ("PS On Tap"), Grill Concepts, Inc., a California corporation ("GC California"), Grill Concepts, Inc., a Nevada corporation ("GC Nevada"), Grill Concepts Services, Inc. ("GC Services"), Grill Concepts Management, Inc. ("GC Management"), GCI-MP, Inc. ("GCI-MP"), PS 303, LLC ("PS 303"), Shift Bar, LLC ("Shift Bar"), GCI-CC, Inc. ("GCI-CC"), and Grill Concepts - D.C., Inc. ("GC-DC") (collectively, the "Debtors").

3. I am in charge of all aspects of the Debtors' business operations, and I have personal knowledge of all major aspects of the Debtors' business affairs, day-to-day operations, books and records, and its record keeping and accounting systems. I also have personal knowledge based upon the business records that are made and maintained in the Debtors' ordinary course of business as well as based upon the information supplied to me by my colleagues who report directly to me.

4. I submit this declaration in support of the Debtors' First Day Motions, including: 1. *Ex Parte* Motion for Joint Administration; 2. *Ex Parte* Motion to Limit Service of Notice; 3. Emergency Motion to Extend Time to File Case Opening Documents; 4. Emergency Motion to Pay Pre-Petition Wages and Honor Employee Benefits Programs; 5. Emergency Motion to Honor Gift Cards Program, On-Line Delivery Program, and Electronic Payment Program; 6. Emergency Motion to Maintain Bank Accounts and Cash Management System; 7. Emergency Motion re Insurance Premium Finance Agreement; and 8. Emergency Motion to Reject Unexpired Leases.

**A.    BACKGROUND**

5. For over 30 years, the Debtors have owned and operated a chain of restaurants featuring upscale casual and fine dining experiences under three unique concepts: a luxury steakhouse reminiscent of the American grills in the 1930's and 1940's operating under the name *The Grill on the Alley*; a family-friendly grill operating under the name *Daily Grill Restaurant &*

*Bar*; and a school-themed Gastropub operating under the name *Public School on Tap*. The Debtors' restaurants are located primarily in Southern California with additional restaurants located throughout other major cities in the United States.

6. The emergence of the global coronavirus pandemic and the resulting governmental restrictions on dine-in services, however, have completely devastated the entirety of the Debtors' retail dining operations. The Debtors have implemented drastic cost-cutting measures to safeguard and maintain its business operations. However, the Debtors have been prevented from operating at full capacity due to the extended periods of governmental restrictions on in-door dining.

7. Currently, the Debtors are operating eight (8) restaurants, they are also managing three (3) additional restaurants through management agreements with various hotels, they have closed fourteen (14) locations, and they are planning to reopen certain of the closed locations as the market conditions improve.

8. As a result of the financial devastation wrought by the pandemic and the associated government restrictions on dine-in service, the Debtors have been unable to generate sufficient cash flows to cover their operating expenses, including primarily lease obligations and tax liabilities, and as a result, they have amassed unprecedented liabilities that cannot be sustained.

9. Accordingly, on April 28, 2021 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief pursuant to subchapter V of chapter 11 of the Bankruptcy Code in order to restructure their liabilities, to shed unprofitable locations, and to retain the profitable locations. Upon reorganization, the reorganized Debtors will be well-positioned to take advantage of the anticipated rebound in the hospitality sector that will coincide with the vaccine rollout and generate significant value for the creditors.

**B.    JOINT ADMINISTRATION**

10. The Debtor are all affiliated entities. While GC Nevada is the corporate parent, the business activities are carried out through other subsidiaries and affiliates. PS On Tap, the debtor of the lead case, owns Pubic School 818, located in Sherman Oaks, California, which is one of the core restaurants that the Debtors plan to retain as part of its portfolio. Once the governmental

restrictions are lifted, and provided that acceptable accommodations can be reached with the Landlord regarding the lease, the Debtors anticipate that Sherman Oaks location will again become a successful restaurant and generate healthy revenues for the enterprise. The other affiliated entities (GC California, GCI-MP, PS 303, Shift Bar, GCI-CC, GC-DC) are associated with other specific restaurant locations. GC Management is the contracting entity for the managed locations. And GC Services processes all payroll obligations for the enterprise as a whole.

11. While each of the individual Debtors maintains separate legal identities and has separate assets and liabilities, many of the business operations have been consolidated in order to achieve efficiencies and to save on administrative costs, including payroll, accounting, advertising, legal, management, and other administrative services. The liabilities are then charged back to the legal entity that incurred the liability through inter-company accounting entries.

12. Due to the inter-relatedness of the operations, the Debtors will be collectively seeking reorganization under a joint plan of reorganization. The joint administration of the Debtors' respective estates is warranted and will promote an efficient administration of the cases. As such, their chapter 11 cases will proceed according to the same timetable, and most of the notices, applications, motions and other pleadings filed and orders entered in these cases will effect each of the Debtors.

13. In addition, each of the Debtors will be filing separate schedules and statements of financial affairs. However, the Debtors respectfully request that they be authorized to report their monthly operating reports on a consolidated basis. As many of the business operations have been consolidated in order to achieve efficiencies and to save on administrative costs, the financial reporting must also be made on a consolidated basis. It would be extremely burdensome, costly, and disruptive to the Debtors' operations if the Debtors were required to break out the income and expenses by each individual Debtor on a monthly basis, as the Debtors' current accounting system is not set up to provide financial reporting in such a format on a monthly basis. Accordingly, it is respectfully submitted that the Debtors be authorized to file its monthly operating reports on a consolidated basis.

14. The Debtors operate on a 4-4-5 accounting cycle, whereby the calendar year is divided into 4-week, 4-week, and 5-week time increments (as opposed to by calendar month). This ensures that each period ends on the same day of the week, making the accounting schedule more compatible with the time table for payroll, inventory, and sales. Due to the Debtors' accounting system, the Debtors respectfully request the Court's authority to file its monthly operating reports on a 4-4-5 accounting cycle (as opposed to by calendar month), with each "monthly" operating report due 21 days following the end of each cycle. (The Debtors' accounting periods end on the following dates for the remainder of 2021: 5/23/2021, 6/27/2021, 7/25/2021, 8/22/2021, 9/26/2021, 10/24/2021, 11/21/2021, and 12/26/2021.)

15. There would be no material prejudice to creditors if the Debtors' estates are jointly administered. To the contrary, as noted, joint administration would benefit all creditors by substantially reducing costs and administrative burdens in general. The Debtors do not believe that there are any actual conflicts of interest or that any actual conflicts of interest would arise, as the Debtors effectively operated as a single, integrated enterprise and will continue to do so.

### C. DEBTORS' EMPLOYEES

16. As of the Petition Date, the Debtors employed approximately 400 employees at various restaurants located primarily in California. None of the employees (who are the subject of the motion for authority to pay pre-petition wages) are insiders of the Debtors as that term is defined in Bankruptcy Code section 101(31)(B).

17. Commencing these cases has disrupted the Debtors' normal operations. Unless the Debtors can promptly assure their employees that they will continue meet their employee-related obligations on schedule, the Debtors believe that employee morale will disintegrate. This disintegration could lead to employee resignations, decreased productivity, ill-will, loss of confidence, and general malaise among the employees. It will also expose the Debtors to employee raids by their competitors. The need to retain employees is particularly acute at this time, as the Debtors anticipate that they may be ramping up their restaurant operations to the extent governmental restrictions on in-door dining are lifted.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

18.     In short, if the Debtors do not receive authority to honor their obligations to employees in the ordinary course of business, that would greatly diminish the Debtors' ability to retain the necessary personnel to maintain their business operations and it would also severely jeopardize their ability to take advantage of the business opportunities created by the loosening of governmental restrictions. Without these employees, the Debtors cannot achieve the stability necessary for the difficult transition to operating as debtors in possession, to maintain their existing operations, and to ramp up to meet increased demand. It is crucial, therefore, that the Debtors promptly receive authority to honor their obligations to their employees.

19.     The importance of the Debtors' employees to their continued operations cannot be overemphasized. The restaurant business is labor-intensive, and retaining experienced and well-qualified employees are crucial to the Debtors' ability to sustain their operations, to continue to generate revenues, and to retain customers. Replacing the Debtors' employees would be extremely difficult, highly disruptive, and cause irreparable damage the Debtors' on-going business operations. And if such employees were to leave *en masse* as a result of the chapter 11 filings, it could devastate the Debtors' operations.

### D.     EMPLOYEE WAGES AND SALARIES

20.     The Debtors fund their payroll though an account maintained by Grill Concepts Services, Inc. ("GC Services") at Bank of America (the "Payroll Account"). During the ordinary course of business, employees are paid on a bi-weekly basis and receive their paychecks on a Friday. GC Services, however, does not make direct payments to its employees. Rather, GC Services funds a third-party payroll service, Paylocity, which debits the Payroll Account shortly prior to the payroll date. Paylocity then makes all required payments to employees as well as any necessary withholdings for taxes, etc.

21.     GC Services has funded payroll through to April 25, 2021. GC Services estimates that it owes approximately $78,000 in payroll from the end of the last payroll period through to the day before the Petition Date (the "Wages and Salaries"). A chart listing the Debtor's current employees and the estimated wages owed is set forth in the chart that is attached as **Exhibit "A"** to the separately-filed Emergency Motion to Pay Pre-Petition Wages. All of the employees listed

in Exhibit A are current employees, they are not "insiders," and the estimated wage for each employee is below the $13,650 cap, which I am informed and believe is the cap set forth in 11 U.S.C. § 507(a)(4).

22. The payment of such Wages and Salaries will not render the Debtors' estates administratively insolvent, as the estates collectively have set aside $2 million in a payroll trust fund to cover payroll, and the Debtors' business operations are currently generating a positive cash flow.

23. The Debtors are filing a Joint Plan of Reorganization that will allow the Debtors to restructure their liabilities, to shed the unprofitable locations, and to retain the profitable locations that will generate sufficient positive cash flows that will fully pay all allowed administrative claims, fully pay all allowed post-petition priority claims, and pay all general unsecured creditors in a percentage that will be materially greater than under a chapter 7 liquidation. However, the failure to pay unpaid wages and salaries of the employees who provide the services that generate the Debtors' revenues could threaten the Debtors' reorganization efforts by undermining employee morale and confidence and creating a serious risk that employees would cease working for the Debtors.

### E. EMPLOYEE BENEFITS PROGRAMS

24. The Debtors provide their employees with a variety of benefit programs in addition to wages and salaries. These benefit programs include such standard benefits as paid time off ("PTO"); medical, dental and vision, workers compensation, 401-k plan and deferred compensation plan (collectively, the "Employee Benefits Programs").

25. Although certain benefits earned or benefit claims under the Employee Benefits Programs might constitute prepetition claims, many of these claims have not yet been reported. Hence, it would be virtually impossible for the Debtors to calculate the exact benefits accrued by each employee during the prepetition period and to identify and treat separately the prepetition and post-petition claims arising under the benefit programs.

26. <u>PTO</u>: The Debtors' employees accrue various paid time off ("PTO"), including vacation, sick leave, and corporate flex time. PTO is earned at different levels depending upon

years of service and position with the Debtors, the position, and the location of the place of employment. While the rates of accrual varies depending on a number of factors, for most employees, during the first 4 years of employment, they earn approximately 3.81 hours of PTO for each pay period. Accrued PTO is capped at 150% of annual entitlement. The Debtor estimates that their potential outstanding liability for accrued, unused PTO is approximately $900,000 in the aggregate.

27. <u>Health Benefits</u>: Medical, dental, and vision (collectively, "Health Benefits") are made available to all full-time and part-time employees. Approximately 22% of the Debtors' eligible employees participate in a Health Benefits plan. The Debtors have contracted with third party insurance companies to provide the Health Benefits. The premiums are financed and are paid on a monthly basis, in the sum of approximately $54,400.

28. Employee contributions to Health Benefits plans have been and are collected bi-weekly through payroll deductions from participating employees. Cobra payments from terminated employees are also collected monthly by the Debtors from such individuals. These amounts are not (and are not required to be) placed in any segregated account.

29. The Debtors believe that it is current with all obligations to the third party insurance companies with respect to Health Benefits. However, to the extent there remains any prepetition amounts due, the Debtors believe that it is necessary and appropriate to pay such amounts on an uninterrupted basis, even if this involves the payment of prepetition claims. The Debtors also believe that it is necessary and appropriate to transfer the employee contributions, and Cobra payments received, to the third party providers even if they involve prepetition amounts. Furthermore, the Debtors believe that it is proper to continue such actions and pay such amounts as they come due post-petition.

30. <u>Workers' Compensation and Benefits</u>: The Debtors have also contracted with third party insurance companies to provide their employees workers' compensation insurance and benefits. The premiums are financed and are paid on a monthly basis, in the sum of approximately $52,000.

31.     The Debtors believe that they are current with all obligations to the third party insurance companies with respect to these benefits.  However, to the extent there remains any prepetition amounts due, the Debtors believe that it is necessary and appropriate to pay such amounts on an uninterrupted basis, even if this involves the payment of prepetition claims.  Furthermore, the Debtors believe that it is proper to continue such actions and pay such amounts as they come due post-petition.

32.     <u>Tax Deferred Savings Plan / 401-K Plan</u>:  The Debtors offer eligible employees a deferred compensation plan to which employees may defer a portion of their compensation each pay period on a pre-tax basis (the "401-K Plan").  All regular employees who are 21 years of age and over may become a participant in the plan after completing 1 year of service and 1,000 hours worked.

33.     Under the 401-K Plan, the Debtors matches 25 cents on the dollar for the first 6% contributed.  Employees become fully vested in the employer contribution pursuant to a 6 year schedule.  Employees are also permitted to borrow up to 50% of their vested 401-K Plan account, with the loan repayments deducted from subsequent payroll checks.

34.     The Debtors estimate that the contributions made by the employees average approximately $86.00 per paycheck.  The Debtors seek authority to continue to permit the third-party administrator, Empower Retirement, to administer the Plan in the ordinary course of business.

### F.     THE GIFT CARD PROGRAM

35.     Prior to the Petition Date, and in the ordinary course of business, the Debtors engaged in various marketing and promotional practices to increase revenues, including issuing gift cards. Customers may purchase pre-paid, no-fee, non-expiring gift certificates in customizable denominations (the "Gift Cards").  The Gift Cards were sold either directly at the restaurant locations or sold on-line, through a third party gift card processor, CashStar, Inc. (the "Gift Card Payment Processor").  In addition, the Gift Cards were also marketed through various promotions with other non-competing businesses, such as Costco.

36. Significantly, when a customer uses a Gift Card as a method of payment, the average purchase price is significantly greater than the value of the Gift Card, thereby further driving up revenues for the restaurants.

37. The Debtors estimate that as of the Petition Date, there was approximately $1.45 million in non-cash liabilities related to the Gift Cards. In 2019, the Debtors estimate that it received approximately $865,000 worth of Gift Card purchases in cash sales, and redeemed approximately $915,000 worth of Gift Cards.

38. Continuing to honor and maintain the Gift Card Program is essential and critical to the Debtors' business operations and maintaining customer confidence. Honoring the Gift Card Program will promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand. Continued use of the Gift Card Program will also enable the Debtors to protect their customer base and take advantage of revenue growth opportunities. If the Debtors were not authorized to continue to honor and maintain the Gift Card Program, that would cause irreparable harm and damage to the Debtors' operations, as it would engender ill-will with the Debtors' customers, result in a loss of confidence in the brand, and lead to an erosion of the customer base.

### G. ON-LINE DELIVERY SERVICES.

39. The Debtors maintain various contractual arrangements with Grubhub, Postmates, DoorDash, ezCater, and Uber Eats ("On-Line Delivery Services") pursuant to which customers can place food orders through their e-commerce platforms with one of the Debtors' restaurants and then arrange for prompt pick-up and delivery of the food orders. The On-Line Delivery Services collect payment directly from customers and remit payment to the Debtors, net of any commissions and other related fees, which vary by geographic area. In addition, there may be charge backs for any number of reasons, including cancelled orders, changed order, non-received orders, corrections, etc.

40. It is possible that certain processing fees and charge backs associated with orders placed prior to the Petition Date may not have been netted out and deducted against the payments

received prior to the Petition Date, as these calculations and adjustments are delayed in the ordinary course of business.

41. The Debtors believe that the on-line delivery services provided by these third party vendors are integral to the Debtors' restaurant business, as they generate substantial sales and encourage repeat business from loyal customers, all of which inure to the benefit of the estates. The amount of sales generated through the On-Line Delivery Services have been particularly robust due to the pandemic and the associated restrictions on in-door dining. Even with the anticipated easing of restrictions on in-door dining in the near future, the Debtors believe that the sales placed through On-Line Delivery Services will continue to play an important role in generating revenues for the Debtors.

### H. ELECTRONIC PAYMENT METHODS.

42. The Debtors accept payments through, among others, American Express, Visa, MasterCard, Discover, Diners, and JCB credit cards, debit cards, and gift cards from customers in restaurant and online (collectively, the "Electronic Payment Methods"). To process the Electronic Payment Methods, the Debtors are parties to certain agreements with these various payment processing companies (the "Payment Processing Companies"). The processing fees charged by these Payment Processing Companies vary depending on the terms of the applicable agreements, and they may range from approximately 1.9% to 2.6% of gross sales. In addition, there may be charge backs for any number of reasons, including cancelled orders, changed order, non-received orders, corrections, etc.

43. It is possible that certain processing fees and charge backs associated with orders placed prior to the Petition Date may not have been netted out and deducted against the payments received prior to the Petition Date, as these calculations and adjustments are delayed in the ordinary course of business.

44. Maintaining the Electronic Payment Methods is essential to the operation of the Debtors' businesses because the majority of the Debtors' sales—indeed, the majority of all dining and takeout sales—are made using one of the Accepted Payment Methods. Declining the

Accepted Payment Methods would have a severe negative effect on the Debtors' ongoing operations, the cost of which would be borne by their estates.

45. The Debtors have sufficient funds to pay the amounts described above in connection with the Gift Card Program, the On-Line Delivery Services, and the Accepted Payment Methods in the ordinary course of business by virtue of expected cash flows from ongoing business operations and the existing cash on hand. In addition, under the Debtors' existing cash management system, the Debtors can readily identify all payments and deductions relating to any authorized payment with respect to the payments described herein and will be able to avoid inadvertently honoring unauthorized payments.

## I. THE DEBTORS' BANK ACCOUNTS

46. The Debtors' bank accounts are maintained at Bank of America and Wells Fargo.

47. In preparation for the bankruptcy, the Debtors have closed down a majority of their bank accounts but have retained the following categories of bank accounts that are necessary for their operations. First, the Debtors have retained various "Revenue Sub Accounts" for GC California and GCI-MP, which are accounts created to collect revenues for certain of the restaurant locations. The Revenue Sub Accounts are electronically linked to various on-line delivery service providers as well as electronic payment processors, and therefore, the Debtors must retain these bank accounts in order to avoid any disruptions or loss in the revenues collected from each of the restaurant locations. The Debtors have created new Concentration Accounts for GC California and GCI-MP, to which the revenues from each of the Revenue Sub Accounts are swept. Disbursements on behalf of each of the restaurant locations will be made out of the new Concentration Accounts. The Revenue Sub Accounts and the new Concentration Accounts are maintained at Bank of America and are as follows:

| Grill Concepts Inc. (CA) | |
|---|---|
| ****8108 | New Concentration Account |
| ****0834 | DG Irvine Revenue Sub Account |
| ****0839 | DG Century Revenue Sub Account |
| ****0853 | DG Studio City Revenue Sub Account |
| ****8950 | DG Bethesda Revenue Sub Account |

| ****0815 | DG Palm Desert Revenue Sub Account |
|---|---|
| ****0858 | DG Graton Revenue Sub Account |
| **GCI-MP Inc.** | |
| ****8122 | New Concentration Account |
| ****8944 | PS 972 Revenue Sub Account |
| ****8949 | PS 303 Revenue Sub Account |
| ****8968 | PS 214 Revenue Sub Account |
| ****8982 | PS 818 Revenue Sub Account |
| ****8987 | PS 310 Revenue Sub Account |
| ****9014 | PS 213 Revenue Sub Account |

48.  Second, the Debtors have retained the following General Operating Accounts for GCI-CC, GC-DC, Shift Bar, and GC Nevada to collect revenues and to make disbursements on behalf of various restaurants.  These accounts are likewise electronically linked to various on-line delivery service providers as well as electronic payment processors, and therefore, the Debtors must retain these bank accounts in order to avoid any disruptions or loss in the revenues collected from each of the restaurant locations.  The General Operating Accounts (at Bank of America) and the corresponding restaurant locations are as follows:

| DEBTOR | ACCOUNT NO. | LOCATION |
|---|---|---|
| GCI-CC, Inc. | ****9019 | Daily Grill Santa Monica |
| Grill Concepts – D.C., Inc. | ****8925 | Daily Grill Washington DC |
| Shift Bar, LLC | ****0513 | Public School 702 |
| Grill Concepts, Inc. (NV) | ****0810 | Daily Grill Denver |

49.  Third, GC Services has retained a payroll trust account at Bank of America (account no. ****0735), which is electronically linked to Paylocity, which processes the payroll payments to the Debtors' employees.

50.  Fourth, GC Management has retained the following General Operating Accounts and FFE Subaccounts at Bank of America for each of the three (3) managed locations.  The General Operating Accounts are for receipts and disbursements for each of the managed locations,

while the FFE Trust Accounts are trust accounts to collect funds necessary to contribute to each managed location's furniture, fixtures, and equipment – a requirement under the management contracts.   These accounts are as follows:

| DEBTOR | ACCOUNT NO. | LOCATION |
|---|---|---|
| Grill Concepts Management Inc. | ****0599 | Daily Grill Houston General Operating Account |
| Grill Concepts Management Inc. | ****0617 | Daily Grill Houston FF&E Trust Account |
| Grill Concepts Management Inc. | ****0679 | Daily Grill Tulsa General Operating Account |
| Grill Concepts Management Inc. | ****0693 | Daily Grill Tulsa FF&E Trust Account |
| Grill Concepts Management Inc. | ****0532 | GotA San Jose General Operating Account |
| Grill Concepts Management Inc. | ****0551 | GotA San Jose FF&E Trust Account |

51.    Fifth, the Debtors have retained a Wells Fargo account (account no. ****5735) for general operations.

52.    The signature cards for of each of the foregoing described accounts (collectively, the "Debtors' Accounts") will be promptly changed to reflect the Debtors' "debtor in possession" status.

53.    The Debtors' cash management system is efficient and effective.  It will be disruptive to the Debtors' ongoing business operations to shut the existing system down and close the Debtors' Accounts.  Such a disruption would require the Debtors to dedicate its limited personnel to opening approximately twenty new bank accounts, transferring on-line accounts with various vendors, and making arrangements to pay vendors from those new accounts – all with no corresponding benefit to creditors.  Further, a drastic change in the cash management system would likely confuse the Debtors' numerous vendors and service providers, disrupt the flow of revenues, and distract the Debtors from ensuring stable day-to-day operations.  The resulting effects could cause irreparable harm to the Debtors' operations and their efforts to restructure their financial affairs.

4891321.2                                            14

### J.     THE DEBTORS' INSURANCE

54.    The Debtors, in the ordinary course of business and in connection with their business operations, maintain various insurance policies and procedures, including, but not limited to, general liability insurance, workers' compensation insurance, property insurance, director and officer insurance, medical insurance, and other policies. The Debtors maintain medical, dental and vision insurance for its employees, which is discussed above. The Debtors also maintain automobile insurance coverage with Liberty Mutual, and the premiums have been pre-paid. The Debtors' worker's compensation insurance coverage is underwritten by Berkshire Hathaway, and operates on a "pay-as-you-go" basis. The Debtors' general liability insurance coverage is underwritten by Crum & Forster, and the premiums are paid with a down payment followed by 10 monthly installment payments. The Debtors must continue to pay the monthly insurance payments due in connection with the foregoing policies in order to maintain necessary coverage. In addition, Debtors maintain umbrella and excess insurance coverage with Travelers. (The foregoing insurance policies shall be collectively referred to herein as the "Insurance Policies").

55.    The Debtors have entered into an Premium Finance Agreement with First Insurance Funding to finance the premiums due under the Travelers policy. A total of 10 monthly installment payments, each in the sum of $8,563.71, are due under the Premium Finance Agreement. The Debtors are current on the monthly payment obligations. A true and correct copy of the Premium Finance Agreement is attached as **Exhibit "A"** to the separately-filed Emergency Motion for Order Authorizing Debtors to Satisfy All Obligations Relating to Insurance and Premium Financing Agreements.

56.    Pursuant to the Premium Finance Agreement, which was entered into prior to the Petition Date, the Debtors' obligations to pay the premiums are secured by, *inter alia*, the unearned premiums and other sums that may become payable under the Debtors' insurance policies that are financed. Accordingly, the Debtors must continue to honor the obligations due under the Premium Finance Agreement in order to maintain the Travelers policy which together with the other Insurance Policies are essential to the preservation and protection of the Debtors' business.

### K.   REJECTION OF CERTAIN LEASES

57.   As part of their ongoing efforts to stabilize the business, the Debtors initiated a comprehensive review and analysis of their lease portfolio.  As a result of initial review of this analysis, the Debtors, in their reasonable business judgment, have decided to permanently close certain underperforming restaurants identified in Schedule "1" which is appended to the Proposed Order that is attached as Exhibit "A" to the Motion to Reject Leases (the "Underperforming Restaurants").  After carefully evaluating a number of factors, including the revenues and expenses of each of these locations, and in consultation with their advisors, the Debtors have concluded that it is not feasible to continue to operate the Underperforming Restaurants, nor do the leases associated with the Underperforming Restaurants have any value to the Debtors (the "Leases").

58.   As such, the Debtors have determined, in the exercise of their business judgment, that it is in the best interests of their estates to seek authority to reject the Leases.  Promptly rejecting the Leases will allow the Debtors to avoid the potential accrual of unnecessary administrative expenses.

59.   The Debtors have given notice of the rejection to each of the landlords for the Leases that are being rejected (the "Landlords"), the Debtors have already returned, or are in the process of returning, possession of the premises back to the Landlords and turning over the keys, the Landlords have full access to the premises and can re-let the premises, and the Debtors have filed this Motion seeking emergency relief immediately after the commencement of their chapter 11 cases.

60.   The Debtors have accumulated at the Underperforming Restaurants certain remaining miscellaneous assets (the "Remaining Property").  The Debtors estimate that the Remaining Property is of *de minimis* value; and as such, the Debtors will not realize any economic benefit by retaining such Remaining Property.  Accordingly, the Debtors request authority to abandon any Remaining Property located at the Underperforming Restaurants.

1 | I declare under penalty of perjury that the foregoing is true and correct to the best of my
2 | knowledge and belief.
3 | Executed on April 29, 2021, at Las Vegas, Nevada.

_____
CLAUDE R. COGNIAN

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: Freeman, Freeman & Smiley, 1888 Century Park East, Suite 1500, Los Angeles, CA 90067.

A true and correct copy of the documents entitled: **DECLARATION OF CLAUDE R. COGNIAN IN SUPPORT OF THE DEBTORS' FIRST DAY MOTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 29, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

J Scott Bovitz on behalf of Creditor Moss & Company, Inc.
bovitz@bovitz-spitzer.com

Carol Chow on behalf of Debtor PS On Tap, LLC
carol.chow@ffslaw.com, easter.santamaria@ffslaw.com

Russell Clementson on behalf of U.S. Trustee United States Trustee (SV)
russell.clementson@usdoj.gov

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

**COURTESY COPY TO HON. MARTIN R. BARASH**

☐ Service information continued on attached page

**2.    SERVED BY UNITED STATES MAIL:**

On **April 29, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**2.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *(date)* _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 29, 2021 | Easter A. Santa Maria | *[signature]* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

*In re PS On Tap, LLC, et al.*

**Case No.** 1:21-bk-10757-MB

**SERVICE LIST**

Bank of America
333 S. Hope St.
Los Angeles, CA 90071
Attn: Attn: Marc Hamud

Ring Associates LLC
1200 18Th Street NW, Suite 1010
Washington, DC 20036

Laurel Center Group
6300 Wilshire Boulevard, Suite 1800
Los Angeles, CA 90048
Attn: Ira Smedra

Aventura Mall Venture/fbo Lehman Brothers Bank FSB
PO Box 865006
Orlando, FL 32886
Attn: George Radu

TMG II Bethesda Hotel LLP
1 Bethesda Metro Center
Bethesda, MD 20814
Attn: Charlie Schweiger

PPF OFF 1601 Wewatta Street, LLC dba Prime Property Fund
1601 Wewatta Street, Suite 860
Denver, CO 80202
Attn: Lindsay Stearns

CA Colorado Center Ltd
PO Box 847113
Los Angeles, CA 90084
Attn: Alexander Cameron

Moss & Company
15300 Ventura Blvd, Suite 416
Sherman Oaks, CA 91403
Attn: Jaclyn Feinberg

Spivak Restaurant Development LLC
860 Norman Place
Los Angeles, CA 90049

Culver Salar Family Investment LLC
201 Wilshire Blvd Ste A 28
Santa Monica, CA 90401
Attn: Daniel Rafalian

3700 MCKinney Ltd
PO Box 205532
Dallas, TX 75320
Attn: Jennifer Harris

Graton Economic Development Authority
c/o James E. Cohen - Maier Pfeffer Kim Geary & Cohen, LLP
1970 Broadway, Suite 825
Oakland, CA 94612

Prestonwood Pond LLC
14860 Montfort Dr, Suite 107
Dallas TX 75254
Attn: Michael Aguilar

Sysco North Texas
800 Tinity Drive
Lewisville, TX 75056
Attn: Cary Nelms

Sysco San Francisco Inc
5900 Stewart Avenue
Fremont, CA 94538
Attn: Cary Nelms

Sysco Los Angeles Inc
20701 East Currier Road
Walnut, CA 91789
Attn: Cary Nelms

Galleria Mall Investors LP
PO Box 849111
Dallas, TX 75284

Healthy San Francisco
PO Box 194367
San Francisco, CA 94119

HST Lessee LAX LP dba Westin LAX
5400 West Century Blvd
Los Angeles, CA 90045
Attn: Greg Fang

Sysco Baltimore LLC
8000 Dorsey Run Road
Jessup, MC 20794
Attn: Cary Nelms

4481944.1