# FOR PUBLICATION

FILED & ENTERED

MAR 31 2025

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Catullo   DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>PS ON TAP, LLC, a California limited liability company, et al.,<br><br>          Reorganized Debtors.<br><br>Affects:<br>☐ ALL DEBTORS<br><br>---<br><br>☐ PS ON TAP, LLC, a California limited liability company<br>☐ GRILL CONCEPTS, INC., a California corporation<br>☐ GRILL CONCEPTS, INC., a Nevada corporation<br>☒ **GRILL CONCEPTS SERVICES, INC., a California corporation**<br>☐ GRILL CONCEPTS MANAGEMENT, INC., a California corporation<br>☐ GCI-MP, INC., a California corporation<br>☐ PS 303, LLC, a Colorado limited liability company<br>☐ SHIFT BAR, LLC, a Nevada limited liability company<br>☐ GCI-CC, INC., a California corporation<br>☐ GRILL CONCEPTS - D.C., Inc., a District of Columbia corporation | Lead Case No.:  1:21-bk-10757-MB<br><br>Jointly Administered with Case Nos. 1:21-bk-10778-MB; 1:21-bk-10759-MB; 1:21-bk-10760-MB; 1:21-bk-10761-MB; 1:21-bk-10779-MB; 1:21-bk-10762-MB; 1:21-bk-10763-MB; 1:21-bk-10781-MB; and 1:21-bk-10764-MB<br><br>Chapter 11<br><br>**MEMORANDUM OF DECISION** |

1      Following confirmation of its plan under subchapter V of chapter 11, reorganized debtor

2  Grill Concepts Services, Inc. ("Debtor") applied for and obtained approval from the Internal

3  Revenue Service ("IRS") for employee retention credits (the "ERCs") first authorized under the

4  Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), enacted in 2020.

5  Following confirmation of its chapter 11 plan, Debtor requested and the IRS ultimately authorized

6  ERCs for each of three calendar quarters in 2021: one quarter that began and ended before the

7  commencement of this case ("Q1-21"), one quarter that straddles the prepetition and postpetition

8  periods ("Q2-21"), and one quarter that is completely postpetition ("Q3-21").  The Court confirmed

9  Debtor's plan in 2021.

10      Thereafter, the IRS offset the entire ERC for Q1-21 and a prorated portion of the ERC for

11  Q2-21, collectively more than $2.2 million, against the IRS' allowed priority and nonpriority claims

12  for certain prepetition taxes and penalties.   The IRS issued a refund to Debtor for the entirety of

13  the ERC for Q3-21.

14      Debtor has filed motions seeking enforcement of the confirmed plan and objecting to the

15  revised claim of the IRS (the "Motions"), arguing that the setoff of the ERCs for Q1-21 and Q2-21

16  was improper.  Debtor seeks to unwind the setoffs and require the IRS to issue refunds based on a

17  reapplication of the ERCs.  Debtor makes four principal arguments: (i) setoff of the ERCs against

18  the IRS' prepetition claims violated the requirements of Bankruptcy Code[1] section 553, (ii) the IRS

19  did not preserve its setoff rights because it did not file proof of a "secured" claim prior to

20  confirmation of Debtor's plan, (iii) the ERC offsets violated the terms of the confirmed plan, which

21  is res judicata, because they were not applied first against the IRS' priority claims for so-called

22  "trust fund taxes," then against other priority claims, and finally against nonpriority claims; (iv) the

23  setoffs should be unwound as a matter of equity.

24      The Court rejects each of these arguments.  First, the requirements of Bankruptcy Code

25  section 553(a) are satisfied here because the ERCs and tax claims are between the same parties, in

26  

27  [1] References herein to the "Bankruptcy Code" refer to title 11 of the United States Code, 11 U.S.C.

28  § 101, et seq.

1

1  the same capacity, and they pertain to prepetition tax periods.  That the IRS determined and

2  awarded the ERCs postpetition is immaterial.  Under applicable law, the entirety of the Q1-21

3  ERC, and the prorated prepetition portion of the Q2-21 ERC, are prepetition obligations of the IRS

4  because they are based on the prepetition activities of Debtor, even though Debtor did not request

5  the ERCs, and the IRS did not recognize them, until after the petition had been filed.  Further, the

6  Court rejects the contention that the Q1-21 ERC was ineligible for setoff because it was created

7  "for the purpose of obtaining a right of setoff against the debtor," pursuant to section 553(a)(3).

8      Second, the Court finds that the IRS expressly preserved its setoff rights by including

9  adequate reservation of rights language in its proofs of claim, which were filed before confirmation

10  of the plan.

11      Third, the ERC offsets effectuated by the IRS did not violate the terms of the confirmed

12  plan.  Although the plan provides for the application of *payments* to the IRS' different claims in a

13  particular order, the plan says nothing about the exercise rights of *setoff* by the IRS.  Irrespective of

14  whether a plan may properly contain such provisions (an issue the Court finds it unnecessary to

15  resolve), the language of the plan does not contain such provisions.  Nothing in the plan expressly

16  addresses the IRS' setoff rights or otherwise put the IRS on notice that Debtor intended to alter

17  those rights.  As a result, Debtor's confirmed plan is not *res judicata* on the issue of the IRS' setoff

18  rights.

19      Fourth, the Court concludes that it should not unwind the IRS' setoffs as a matter of equity.

20  Although it appears that Debtor and its affiliates are continuing to experience financial distress

21  postpetition, and would benefit from the requested relief, the Court does not believe it would be

22  equitable to unwind the setoffs.  Debtor was in the best position to propose an alteration of the IRS'

23  setoff rights when it proposed its plan.  Although the Court cannot say whether it would have

24  approved a plan containing such provisions, proposing a plan that expressly addressed the IRS'

25  setoff rights would have presented the issue for consideration by the IRS and the Court.  But that is

26  not what happened.  Under these circumstances, it would be unfair to the IRS to unwind its

27  lawfully exercised setoffs.

28

# I.

## JURISDICTION, ADJUDICATIVE AUTHORITY & VENUE

The Court has jurisdiction over the Motions pursuant to 28 U.S.C. § 1334(b), because the disputes presented arise under provisions of the Bankruptcy Code, including sections 502, 553 and 1141. As such, the motions pertain to statutorily and constitutionally core matters, which have been properly referred to this Court by the district court, and over which this Court has the adjudicative authority to enter a final order. *See* 28 U.S.C. § 157(b)(2); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). The Court also finds that venue for consideration of the Motions is proper under 28 U.S.C. § 1409(a) because the Motions were filed in the court where Debtor's chapter 11 case is pending.

# II.

## BACKGROUND

### A. The Case and the Plan

Debtor filed its voluntary petition under subchapter V of chapter 11 on April 28, 2021 (the "Petition Date"), together with voluntary petitions for nine other debtor-affiliates (collectively, "Joint Debtors.") The cases for Joint Debtors have been jointly administered since April 30, 2021, under Case No. 1:21-bk-10757-MB. ECF No. 12.

On October 22, 2021, the Court entered its order (the "Confirmation Order"), ECF No. 356, confirming the Second Amended Joint Plan of Reorganization Dated July 30, 2021, as Amended (the "Plan"). ECF No. 211. The Plan applies to all Joint Debtors.

Among other things, the Plan provides for the treatment of priority tax claims:

> Each holder of a priority tax claim will be paid in full with required statutory interest of 3.25% per annum or such other interest required by law (commencing on the Petition Date) amortized over four (4) years and paid quarterly with such payments earmarked to first satisfy the trust fund portion of such allowed tax claims. Debtors have the right at their sole discretion to pay down or pay off this claim earlier to reduce interest expense.

ECF No. 211 at 5.  The Confirmation Order contains nearly identical language, but refers to

the accrual of interest from the "Effective Date" rather than the "Petition Date."  ECF No.

356 at 8.

The Plan also provides for the treatment of unsecured nonpriority claims:

> Allowed general unsecured claims whose claims are not satisfied in
> Classes 3A-3B will receive a pro-rata share of the Debtors' actual
> Disposable Net Income for the four (4) year period following the
> Effective Date of the Plan, to be paid annually after the claims of the
> other classes are first satisfied.

> If Class 3C votes in favor of the Plan, the Debtors will guarantee a
> minimum $1 million (with Graton) or $500,000 (without Graton) in
> cash distributions to the pool of allowed claims in Class 3C.

> The Debtors shall have up to six (6) months following the 4-Year
> Plan Period to meet the foregoing guaranteed minimum cash
> distribution requirements. In addition, if Class 3C votes in favor of
> the Plan and the Plan is confirmed, the insider has agreed to
> subordinate its $37 million claim against the Debtors' estates.

ECF No. 211 at 6.  The Confirmation Order contains nearly identical language, noting that

Class 3C did, in fact, vote in favor of the Plan.  ECF No. 356 at 12.

**B. The IRS Proofs of Claim**

The IRS first filed its proof of claim in Debtor's case on May 26, 2021.  Case No. 1:21-bk-

10760-MB, Proof of Claim (hereinafter Claims Dkt.) 2-1.[2]  The IRS thereafter amended its claim

six times.  *See* Claims Dkt. 2-2 (May 28, 2021), 2-3 (August 13, 2021), 2-4 (September 7, 2021), 2-

5 (May 4, 2022), 2-6 (April 4, 2023), 2-7 (April 27, 2023).

The third amended proof of claim was filed after Joint Debtors filed the Plan on August 9,

2021, see ECF No. 211, and two weeks before the Court held its hearing on confirmation of the

Plan on September 24, 2021.  *See* ECF No. 356 at 3:25-26.  The third amended claim asserts debts

totaling $7,253,630.87.  Claims Dkt. 2-4.  This comprises (i) unsecured priority claims of

---

[2] Although Debtor is one of a group of debtors whose cases are jointly administered under Case
No. 1:21-bk-10757-MB, references herein to the "Claims Dkt." refer to the separately maintained
claims docket for Grill Concepts Services, Inc., under Case No. 1:21-bk-10760-MB.

$5,327,971.39 for FUTA (Federal Unemployment Tax) and FICA (Federal Insurance Contributions Act Tax) incurred by Debtor in various prepetition quarters, plus interest accrued prior to the Petition Date, and (ii) unsecured nonpriority claims of $1,925,659 on account of other prepetition penalties and interest.  Claims Dkt. 2-4 at 4.

The third amended proof of claim, and each proof of claim filed by the IRS prior, states that the IRS reserves its right to assert setoffs against these claims:

> The United States has the right of setoff or counterclaim. However, this determination is based on available data and is not intended to waive any right to setoff against this claim debts owed to this debtor by this or any other federal agency.  All rights of setoff are preserved and will be asserted to the extent lawful.

Claims Dkt. 2-4 at 4; *see also* Claims Dkt. 2-1 at 4, 2-2 at 4, 2-3 at 4.

The most recent proof of claim filed by the IRS is the sixth amended proof of claim, which was filed on April 27, 2023.  Claims Dkt 2-7.  In addition to containing identical reservation of rights language, the sixth amended proof of claim notes that liabilities have been paid off since the Petition Date and "[c]redit given on claim for pre-petition refunds." *Id.* at 4.  The claim asserts (i) unsecured priority claims for FUTA, FICA and interest of $3,020,571.20 and (ii) unsecured nonpriority claims for additional interest and penalties of $1,641,039.26.  This proof of claim reflects the balance of the tax due to the IRS as of the Petition Date, after applying the setoff of certain ERCs, which are discussed below. ECF No. 609 at 11:19-20 (Declaration of Rhonda Roberts).

**C. The ERCs**

In March 2020, Congress enacted the CARES Act.  Pub. L. No. 116-136, 134 Stat. 281 (2020).   Under section 2301 of the CARES Act, certain "eligible employers" who paid qualified wages to their employees in 2020 became eligible for an ERC. *See* 134 Stat. 281 § 2301(a) & (b)(1) & (2).  The Taxpayer Certainty and Disaster Tax Relief Act of 2020, Pub. L. No. 116-260, 134 Stat. 1182 (Div. EE) (2020), and section 9651 of the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (2021) (codified at 26 U.S.C. § 3134), extended and modified the ERC for "eligible employers" for calendar quarters in 2021. The Infrastructure Investment and Jobs Act

("IIJA"), Pub. L. No. 117-58, 135 Stat. 429 (2021), retroactively terminated the ERC for most employers; the ERC was thereafter not available in the fourth quarter of 2021 for employers other than recovery startup businesses. *See* IIJA § 80604.

The ERC is available to an "eligible employer . . . as a credit against applicable employment taxes for each calendar quarter an amount equal to 70 percent of the qualified wages with respect to each employee of such employer for such calendar quarter." 26 U.S.C. § 3134(a).  The qualified wages that may be used to calculate the ERC in each calendar quarter are capped.  26 U.S.C. § 3134(b)(1).  Likewise, the amount of the ERC in each quarter shall not exceed the applicable employment taxes (reduced by any credits allowed under sections 3131 and 3132) on the wages paid with respect to the employment of all the employees of the eligible employer for such calendar quarter." 26 U.S.C. § 3134(b)(2).  "If the amount of the credit under subsection (a) exceeds the limitation of paragraph (2) for any calendar quarter, such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." 26 U.S.C. § 3134(b)(3).

Section 6413(b) of the Internal Revenue Code generally authorizes the Secretary of the Treasury to refund overpayments of employment taxes.  26 U.S.C. § 6413(b).  But the existence of an overpayment does not guarantee entitlement to a refund.  Section 6402 of the Internal Revenue Code authorizes the Secretary of the Treasury to offset an overpayment against any tax due the United States:

> In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall, subject to subsections (c), (d), (e), and (f), refund any balance to such person.

26 U.S.C. § 6402(a).  The Secretary of the Treasury also may offset an overpayment against past due support, debts owing to other Federal agencies and past due State income tax obligations.  *See* 26 U.S.C. §§ 6402(c), (d), (f).

On or about January 21, 2022, Debtor applied for ERCs for each of the first three calendar quarters of 2021.  ECF No. 601 at 11-12; 601-1 at 2:16-3:2 (Declaration of Claude R. Cognian),

601-4 (Exhibit 11).  Debtor calculated the ERCs to which it was entitled based on the amount of the eligible wages and health care costs it incurred for each of those quarters and the employment-related taxes owing on those amounts.  *Id.*  The IRS subsequently approved (i) an ERC for Q1-21 (ending March 31, 2021) for $1,478,343.69, (ii) an ERC for Q2-21 (ending June 30, 2021) of $2,446,017.85, and (iii) an ERC for Q3-21 (ending September 30, 2021) in the amount of $2,528,310.77.  ECF No. 609 at 12:1-12:12.

**D. The Setoffs**

In 2023, the IRS offset some of these credits against its prepetition claims and refunded the balance.  Where it determined that the ERC (or a portion thereof) was a prepetition debt owing to Debtor, the IRS setoff those amounts against the IRS' prepetition claims.   Where it determined that the ERC (or a portion thereof) was a postpetition debt owing to Debtor, the IRS issued a refund.  Specifically, the IRS determined that the entire ERC for Q1-21, $1,478,343.69, was a prepetition debt and applied that amount as a setoff against its prepetition claims.  For Q3-21, the IRS determined that the entire ERC for Q3-21, $2,528,310.77, was a postpetition debt and refunded that amount.

With respect to Q2-21, the IRS allocated the ERC between the prepetition and postpetition periods, based on the number of days during the quarter that occurred before and after the Petition Date.  *Id.* at nn.1 & 2.  Based on this allocation, the IRS determined that $725,741.64 (or 30% of the ERC) was a prepetition debt and offset this amount against its prepetition claims.  Conversely, the IRS determined that $1,720,276.21 (or 70% of the ERC) was a postpetition debt and refunded it to Debtor.  Although Debtor contends that no portion of the ERC for Q2-21 should be treated as a prepetition debt, it does not challenge the IRS' arithmetic calculating the prepetition and postpetition portions of Q2-21.

Debtor also contends that when the IRS offset ERC amounts against its prepetition claims, the IRS did so against (i) priority unsecured claims for trust fund tax obligations, (ii) priority unsecured claims for non-trust fund obligations, and (iii) non-priority unsecured claims. ECF No. 601 at 8, 12-13; 601-1 at 3:3-3:7; 601-4 at 104-131 (Exhibit 13).  The IRS does not contest this assertion or provide evidence to the contrary, and the Court will accept this statement as true.  The

1  Court notes, however, that the record is not clear precisely which amounts fall into each of these

2  categories.[3]

3        On March 15, 2024, Debtor filed the Motions, arguing that the setoffs were improper.  ECF

4  No. 601, 602.

5                                    **III.**

6                           **LEGAL ANALYSIS**

7    **A. The IRS Was Entitled to Setoff of the Q1-21 ERC and a Portion of the Q2-21 ERC
        Against Its Prepetition Claims.**

8
        **1.  Setoff under Bankruptcy Code Section 553**

9

10        "The right of setoff (also called "offset") allows entities that owe each other money to apply

11  their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B

12  owes A." *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat.*

13  *Bank*, 229 U. S. 523, 528 (1913)).  "[It is the time honored right of one who is indebted to another

14  to reduce or balance off such indebtedness by charging against the debt sums which his creditor in

15  that transaction may owe him in some other transaction."  Robert H. Skelton, *The Secured Party's*

16  *Rights in a Debtor's Bank Account Under Article 9 of the Uniform Commercial Cod*e, 1977 So. Ill.

17  L. Rev. 120, 186 (1977).

18        "Although no federal right of setoff is created by the Bankruptcy Code, 11 U. S. C. § 553(a)

19  provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in

20  bankruptcy." *Id.*  In relevant part, section 553(a) provides:

21              Except as otherwise provided in this section and in sections 362 and
22              363 of this title, this title does not affect any right of a creditor to

23  ─────────────────────

24  [3]  To be sure, the IRS declarant provided a chart detailing the ERC offsets and the tax debts against
     which the offsets were applied.  ECF No. 609 at 12:13-12:22.   The chart identifies offset amounts
25  by form number and calendar quarter, but the Court cannot readily determine from the chart (or any
     other corresponding evidence) which of these amounts is a "trust fund" tax, some other priority tax
26  debt, or a nonpriority debt.   Moreover, the amounts in that chart do not readily align with the detail
     provided in the amended IRS proofs of claim, or the so-called "Payoff Status Report" sent by the
27  IRS to Debtor's counsel.  Claims Dkt. 2-1 through 2-7; ECF No. 601-4 at 99-103 (Exhibit 12).
     Ultimately, the Court's analysis does not require this kind of detailed calculation.
28

                                      8

1
2

> offset a mutual debt owing by such creditor to the debtor that arose
> before the commencement of the case under this title against a claim
> of such creditor against the debtor that arose before the
> commencement of the case. . . .

3

4

11 U.S.C. § 553(a); *see also* 11 U.S.C § 542(b) (providing that certain debts owing to the debtor

5

must be paid to the trustee or debtor in possession, unless they are subject to setoff under section

553).[4]

6

Section 553(a), however, imposes restrictions on rights of setoff in bankruptcy. *Newbery*

7

*Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996).  First, "each debt or claim

8

sought to be offset must have arisen prior to filing of the bankruptcy petition . . . without regard to

9

whether it is contingent or unliquidated. . . ." *Id.*  (citations omitted).  Second, the offsetting debt or

10

claim must be "mutual," *i.e.*, "'in the same right and between the same parties, standing in the same

11

capacity.'" *Id.* (citations omitted).    Thus, when the IRS asserts a setoff right under the Internal

12

Revenue Code—in this case under 26 U.S.C. § 6402—that right is subject to the requirements of

13

Bankruptcy Code section 553.  *In re Wade Cook Fin. Corp.*, 375 B.R. 580, 591-92 (B.A.P. 9th Cir.

14

2007) (setoff right under section 6402 is subject to the requirements of section 553).[5]

15

---

16

[4] 11 U.S.C. § 542(b) states:

17
18

> Except as provided in subsection (c) or (d) of this section, an entity that
> owes a debt that is property of the estate and that is matured, payable on
> demand, or payable on order, shall pay such debt to, or on the order of, the
> trustee, except to the extent that such debt may be offset under section 553
> of this title against a claim against the debtor.

19

20

21

[5]  Notably, for purposes of applying section 553(a), the terms "debt" and "claim" are synonymous.
*Id.* at 595. As the Bankruptcy Appellate Panel ("BAP") has explained:

22

23

> The Bankruptcy Code defines a "debt" as a "liability on a claim." 11 U.S.C.
> § 101(12); [*Biggs v. Stovin (In re Luz Int'l, Ltd.)*, 219 B.R. 837, 843, 844
> (B.A.P. 9th Cir. 1998)]; *Braniff Airways, Inc. v. Exxon Co.*, 814 F.2d 1030,
> 1035 (5th Cir.1987); *United States v. Gerth,* 991 F.2d 1428, 1433 (8th
> Cir.1993) . A "claim" is a "right to payment, whether or not such right is
> reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,
> unmatured, disputed, undisputed, legal, equitable, secured or unsecured...."
> 11 U.S.C. § 101(5). "'Debt' should be read as being coextensive with the
> term 'claim.'" *Gerth*, 991 F.2d at 1433; *see also Buckenmaier*, 127 B.R. at
> 238 (stating that the meanings of claim and debt are coextensive) (quoting

24

25

26

27

28

(Continued...)

Further, even when setoff is permitted under section 553(a), it may be further limited. *See* 11 U.S.C. §§ 553(a)(1), (2), (3). Here, Debtor argues section 553(a)(3) applies. That section creates an exception to the right of setoff recognized in section 553(a), to the extent that:

> (3) the debt owed to the debtor by such creditor was incurred by such creditor--
>> (A) after 90 days before the date of the filing of the petition;
>> (B) while the debtor was insolvent; and
>> (C) for the purpose of obtaining a right of setoff against the debtor (except for a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561).

11 U.S.C. § 553(a)(3).

**2. Determining When the ERCs "Arose"**

The parties do not dispute that the IRS claims in this case are prepetition claims within the meaning of section 553(a). The parties disagree about the ERCs, *i.e.*, the debts of the IRS that were used to setoff and reduce the IRS claims. Debtor contends that the Q1-21 and Q2-21 ERCs "arose" after the filing of the petition and therefore are ineligible for setoff against the IRS prepetition claims. The IRS disagrees.

Although ERCs are relatively new, the need to determine when tax credits "arose" for purposes of applying section 553(a) is not. When faced with this challenge, courts within the Ninth Circuit repeatedly have looked to the Supreme Court's decision in *Segal v. Rochelle*, 382 U.S. 375 (1966) for guidance. *See In re Wade Cook*, 375 B.R. at 596-97 (adopting "the approach set forth in *Segal v. Rochelle*"); *In re Cook Inlet Energy, LLC*, 580 B.R. 842, 849 (Bankr. D. Alaska 2017) (following *Wade Cook*). In *Segal*, the Supreme Court considered whether entitlement to a tax refund based on a loss carryback was property existing on the petition date (and therefore property of the estate) where it was based on prepetition losses but could not be realized until the postpetition period. *Segal v. Rochelle*, 382 U.S. at 379-80. The Supreme Court concluded the

---

*Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)).

*Id.* at 595.

entitlement had arisen prepetition because it "was sufficiently rooted in the pre-bankruptcy past" and "not outside [the estate's] reach because it is novel or contingent or because enjoyment must be postponed." *Id.*

*Segal* was decided under the former Bankruptcy Act but remains good law under the Bankruptcy Code. *United States v. Sims (In re Feiler)*, 218 F.3d 948, 955 (9th Cir. 2000); *Rau v. Ryerson (In re Ryerson),* 739 F.2d 1423, 1426 (9th Cir. 1984) ("sufficiently rooted in the prebankruptcy past" remains the relevant test to determine when a debtor's property interest arises); *see also In re WVSV Holdings, LLC*, 2023 WL 5548975, *2 (9th Cir. Aug. 29, 2023) ("To decide whether to treat post-petition claims as estate property, the Supreme Court has instructed us to determine whether such claims are 'sufficiently rooted in the pre-bankruptcy past'") (quoting *Segal v. Rochelle*, 382 U.S. 375, 380 (1966)).

In *In re Wade Cook Fin. Corp.*, the trustee argued that an estate loss carryback arose postpetition, and could not be offset against prepetition claims, because the credit could not properly be calculated or enforced until the end of the tax year, which occurred after commencement of the case. 375 B.R. at 590-95. The bankruptcy court agreed with the trustee, but the Ninth Circuit Bankruptcy Appellate Panel ("BAP") reversed. Relying on the approach set forth in *Segal v. Rochelle*, the BAP concluded that the tax credit attributable to the loss carryback was a prepetition obligation because it "was based on losses incurred primarily prepetition." *Id.* at 596. That the credit was not determinable or enforceable until the postpetition period was irrelevant:

> [D]ependency on a postpetition event does not prevent a debt from arising prepetition. The character of a claim does not transform from prepetition to postpetition because that claim is contingent, unliquidated or unmatured when the debtor files its petition. A debt can be owing prepetition even though that debt did not come into existence until postpetition events occurred. Further, there is nothing in the definitions of "debt" or "claim" or in the provisions of § 553 requiring that an amount due must be computed before the bankruptcy petition date.

375 B.R. at 595-96 (citations omitted). Thus, "[t]he fact that the extent of the refund is indeterminate at the time of the filing of the petition does not affect the right of the taxpayer to claim a refund." *Id.* at 596 (citations omitted). In *In re Cook Inlet Energy, LLC*, the bankruptcy

1  court followed the same approach, holding that tax credits attributable to prepetition natural gas

2  operations constituted prepetition credits subject to offset against prepetition claims, and that tax

3  credits attributable to postpetition operations did not.  *In re Cook Inlet Energy, LLC*, 580 B.R. at

4  849.[6]

5       The entirety of Q1-21 ERC, and the prorated prepetition portion of the Q2-21 ERC, are

6  prepetition obligations because they are "sufficiently rooted in the pre-bankruptcy past."  *Segal v.*

7  *Rochelle*, 382 U.S. at 379-80; *In re Wade Cook Fin. Corp.,* 375 B.R. at 590-95.  By statute, an ERC

8  is tied to the activity of an eligible employer occurring during the calendar quarter for which the

9  ERC is recognized.  *See* 26 U.S.C. §§ 3134(b)(1) (ERC is a credit against employment taxes for the

10  applicable calendar quarter); 3134(b)(2) (ERC for a calendar quarter is capped by the total wages

11  paid in that quarter).  Further, the evidence before the Court is that Debtor calculated and applied

12  for the ERCs based on the actual amounts it paid in wages and related health care costs during each

13  quarter.  ECF No. 601 at 11-12; 601-1 at 2:16-3:2 (Declaration of Claude R. Cognian), 601-4

14  (Exhibit 11).

15       With respect to Q1-21, which closed before the commencement of this case, the entirety of

16  the ERC for this quarter is attributable to Debtor's prepetition employment of individuals and its

17  payment of their wages and health care costs for that prepetition employment.  With respect to Q2-

18  21, which straddled the Petition Date, the IRS allocated the ERC between the prepetition and

19  postpetition period, based on the number of days occurring before and after the Petition Date.  The

20

21  _____

22  [6]  *See also Siegel v. FDIC (In re IndyMac Bancorp, Inc.)*, 2012 WL 1037481, at *19-24 (Bankr.
C.D. Cal. Mar. 29, 2012) (report and recommendation), *adopted at* 2012 WL 1951474 (C.D. Cal.

23  May 30, 2012).  Although *In re Indymac Bancorp, Inc.* did not involve setoff under Bankruptcy
Code section 553, it is instructive.  Relying on *Segal v. Rochelle,* the court in *In re Indymac*

24  *Bancorp, Inc.* held that the entitlement to certain tax refunds arose prepetition, and therefore
constituted property of the bankruptcy estate, because they were based on prepetition net operating

25  losses carried back to prior years—even though the relevant tax returns were not actually filed and
the refunds paid until after the petition date.  *Id.* *19-*20.  Like *In re Wade Cook Fin. Corp,* and *In*

26  *re Cook Inlet Energy, LLC,* the court in *In re Indymac Bancorp, Inc.,* determined that the tax
refunds were sufficiently rooted in the pre-bankruptcy past so as to constitute prepetition

27  entitlements.  It was immaterial that the amount was unknown on the petition date and that there
were postpetition events necessary to liquidate and obtain payment of those entitlements.  *Id.* at 20.

28

1   postpetition allocation of the Q2-21 ERC was refunded to Debtor.  The prepetition portion of the

2   Q2-21 ERC was treated as a setoff against the IRS' prepetition claims.  The prepetition proration of

3   this ERC, like the entirety of the Q1-21 ERC, is rooted in Debtor's prepetition employment of its

4   employees.[7]

5        Debtor's arguments to the contrary are unavailing.  Citing the IRS' contention that Debtor

6   "had no rights" to the ERCs until the IRS approved the credits, applied the setoffs and issued

7   refunds in 2023, Debtor argues that the ERCs did not "accrue" until 2023—two years after the

8   Petition Date.  ECF No. 615 at 18:7-20.  This argument, however, is wrong for multiple reasons.

9   First, the argument misconstrues the position of the IRS, which observed nothing more than that a

10  refund cannot be issued until the IRS allows a credit ("overpayment") and determines whether it

11  should be offset against a liability owing the United States ("underpayment").  *See* ECF No. 611 at

12  6:3-8;  26 U.S.C. § 6402(a); *In re Gould*, 401 B.R. 415, 424 (B.A.P. 9th Cir. 2009), *aff'd*, 603 F.3d

13  1100 (9th Cir. 2010).  Second, and more importantly, the argument ignores the teachings of *Segal*

14  *v. Rochelle* and *In re Wade Cook Fin. Corp.*: *i.e.*, that the prepetition or postpetition status of a tax

15  credit is not determined by when it ultimately is enforceable by the taxpayer but instead when it

16  first arises, *i.e.*, whether it is "sufficiently rooted" in the prepetition period.

17       Debtor similarly argues that the entirety of the Q2-21 ERC is a postpetition obligation

18  because "[t]ax refunds accrue on the last day of the applicable tax period, given that the amount of

19  the refund cannot be determined until sometime after the end of the tax period."  ECF No. 615 at

20  19-20.  But the argument suffers the same fate.  It is the very same argument rejected by the BAP

21  in *In re Wade Cook Fin. Corp.,* where the trustee had argued that the "IRS's tax refund obligation

22  did not arise until the end of the taxable year, postpetition." 375 B.R. at 595-96.  The BAP

23  concluded there, as the Court does here, that the obligation of the IRS was "sufficiently rooted" in

24  the prepetition past, even though the tax period straddled the Petition Date.  A tax credit may be a

---

25  [7]  The IRS did not argue in this case that the entirety of the Q2-21 ERC was a prepetition
26  obligation, and instead prorated it.  There is, however, some authority for the proposition that a tax
    credit for a period straddling the petition date may treated, in its entirety, as a prepetition obligation
27  for purposes of setoff under section 553. *See In re Flying J, Inc.*, 2009 WL 521500 (Bankr. D. Del.
28  Dec. 28, 2009).

1    prepetition obligation even when it is unliquidated, contingent or not matured as of the petition

2    date.  *See id.*[8]

3         The authorities cited by Debtor to support its contrary position are unpersuasive.  *See* ECF

4    No. 615 at 19 n.10.  In *Brandt v. Fleet Capital Corp.* (*In re TMCI Elecs.*)*,* 279 B.R. 552, 560

5    (Bankr. N.D. Cal. 1999), the central issue was whether a creditor's prepetition lien attached to the

6    debtor's tax refund.  The bankruptcy court concluded that it did not, characterizing the question

7    presented as one of state law, and distinguishing it from case precedents addressing the issues

8    presented here, *i.e.*, whether tax refunds (i) were subject to setoff under Bankruptcy Code section

9    553 and/or (ii) arose prepetition under *Segal v. Rochelle.  Id.* at 559; *see also In re Indymac*

10   *Bancorp, Inc.*, 2012 WL 1037481 at *21 (distinguishing *In re TMCI Elecs.* on similar grounds).

11        In the other three cases cited by Debtor, courts articulated a "bright line" rule, holding that a

12   debtor's right to a tax credit or refund arises at the end of the tax year to which it relates.  But in

13   each of these cases, the relevant tax period closed *before* the petition date; the question presented

14   was whether the obligation nevertheless arose postpetition, when the debtor later filed a tax return.

15   *See In re Glenn*, 207 B.R. 418, 419 (E.D. Pa. 1997); *In re Richardson,* 216 B.R. 206, 211-213

16   (Bankr. S.D. Ohio 1997); *Rozel Indus., Inc. v. Internal Revenue Service* (*In re Rozel Indus., Inc.*),

17   120 B.R. 944, 948-949 (Bankr. N.D. Ill. 1990).  These courts were not presented with the question

18   presented here, by the Q2-21 ERC: *i.e.*, whether the prorated portion of a credit earned during a tax

19   period that straddles the petition date may constitute a prepetition obligation.  The "bright line" rule

20   espoused in those cases made sense under those circumstances.  But here, it does not.  Faithful

---

22   [8]  Analysis under an analogous line of Ninth Circuit authority leads to the same conclusion.  Courts
     in the Ninth Circuit use the "fair contemplation" test to determine *when* a claim arises, for purposes

23   of allowance under Bankruptcy Code section 502(b).  *In re SNTL Corp.*, 571 F.3d 826, 839 (9th
     Cir. 2009) (citing authorities).  Under that test, "a claim arises when a claimant can fairly or

24   reasonably contemplate the claim's existence even if a cause of action has not yet accrued under
     nonbankruptcy law."  *Id.* (citing *Cool Fuel, Inc. v. Bd. of Equalization (In re Cool Fuel, Inc.)*, 210

25   F.3d 999, 1007 (9th Cir. 2000).  Here, Debtor could fairly or reasonably contemplate that it would
     be entitled to ERCs for Q1-21 and the prepetition portion of Q2-21 prior to the Petition Date.

26   Congress first authorized the ERCs in March 2020.  Irrespective of when Debtor ultimately applied
     for the ERCs, it reasonably could have expected prior to the Petition Date that it would be entitled

27   to claim those credits against the employment taxes incurred during prepetition periods.

28

application of the Supreme Court's holding in *Segal v. Rochelle* under the circumstances presented here, requires the Court to look beyond the closing date of the tax period, and instead examine the basis for the ERCs, even though they may have been inchoate obligations as of the Petition Date.

Finally, Debtor argues that the Q1-21 ERC was improperly offset against the IRS' prepetition claims under Bankruptcy Code section 553(a)(3).  That provision precludes setoff to the extent a debt owed to the debtor by the creditor "was incurred by such creditor— (A) after 90 days before the date of the filing of the petition, (B) while the debtor was insolvent; and (C) for the purpose of obtaining a right of setoff against the debtor [subject to certain exceptions]." 11 U.S.C. § 553(a)(3). Debtor contends the IRS "clearly intended to manufacture a debt in order to apply it as a setoff against the Debtor's pre-petition liabilities."  ECF No. 615 at 20.  But the argument lacks merit.  The record does not support the contention that the IRS "incurred" an obligation for any purpose, let alone for the purpose of obtaining a right of setoff.  Debtor applied for the Q1-21 ERC. Debtor became entitled to this ERC because of its employment activity during Q1-21, as provided by applicable law.  The fact that the IRS later exercised its rights under 26 U.S.C. § 6402(a) to apply the Q1-21 ERC as an offset to its prepetition claims does not mean that that the IRS "incurred" or "manufactured" an obligation for that purpose.

Accordingly, the Court concludes that both the underlying claim of the IRS and the ERC obligations offset by the IRS were prepetition debts.

### 3.  Mutuality of Debts

The remaining requirement for setoff under Bankruptcy Code section 553 is that the claim against the estate and the offsetting obligation against the creditor be "mutual."  *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d at 1398.  This is the requirement that the claim and offsetting obligation be "'in the same right and between the same parties, standing in the same capacity.'"  *Id.* (citations omitted).  Here, the undisputed facts make for a straightforward analysis.  Both the IRS' claims and the offsetting ERCs were owed by and between the IRS, as taxing agency, and Debtor, as taxpayer.  No other parties are involved, and these parties stood in the same capacity with respect to each debt.  Indeed, under the Internal Revenue Code, the ERCs are structured as a credit

1   against an employer-taxpayer's obligation to pay employment taxes.  *See* 26 U.S.C. § 3134(a).

2   Under these circumstances, it could not be clearer that these debts are mutual.

3        Debtor nevertheless contends that there is a lack of mutuality based on the holding in *In re*

4   *Gordon Selway, Inc.*, 239 B.R. 741 (E.D. Mich. 1999).  ECF No. 610 at 13-16.  In that case, a

5   chapter 11 debtor sought to compel the IRS to turnover a tax refund against which it asserted a

6   right of setoff.  The bankruptcy court denied setoff based, in part, on a lack of mutuality, but the

7   district court reversed.  The debtor then appealed to the Sixth Circuit Court of Appeals, which

8   affirmed the district court.  *Gordon Sel-Way, Inc. (In re Gordon Sel-Way, Inc.)*, 270 F.3d 280 (6th

9   Cir. 2000).  Debtor cites but does not discuss the decision of the court of appeals, which is the

10  authoritative decision in that case.

11       As an initial matter, it is not clear how either decision helps Debtor because the court in

12  each instance found that mutuality existed between the debtor and the IRS and held that the IRS

13  was entitled to setoff.  As a substantive matter, moreover, the appellate decision demonstrates why

14  Debtor's reliance on the case is further misplaced.

15       Relying on several bankruptcy court decisions from the early 1980s, the Sixth Circuit Court

16  of Appeals stated there can be no mutuality where a creditor holds a claim against the *debtor* but

17  bears an obligation to the *debtor in possession*.  *In re Gordon Sel-Way, Inc.*, 270 F.3d at 290.  This

18  statement is premised on the theory that the debtor and debtor in possession are separate legal

19  entities.  If true, it follows from this premise that the claim of the IRS against a debtor and an

20  obligation owed by the IRS to the debtor in possession are not "in the same right and between the

21  same parties, standing in the same capacity."

22       But the premise is of dubious merit.  In *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528

23  (1984) [hereinafter *Bildisco*], the Supreme Court rejected the separate entity theory in the context

24  of the enforceability of collective bargaining agreements, stating that if the debtor in possession

25        were a wholly 'new entity,' it would be unnecessary for the

26        Bankruptcy Code to allow it to reject executory contracts, since it
would not be bound by such contracts in the first place. For our

27        purposes, it is sensible to view the debtor-in-possession as the same
'entity' which existed before the filing of the bankruptcy petition, but

28        empowered by virtue of the Bankruptcy Code to deal with its

contracts and property in a manner it could not have employed absent the bankruptcy filing.

*Id.* at 528.

In *U.S. v. Gerth*, the Eighth Circuit Court of Appeals specifically applied the teaching of *Bildisco* in the context of section 553, concluding that for purposes of mutuality, the prepetition debtor and postpetition debtor in possession are the same legal entity. 991 F.2d 1428, 1435-36 (8th Cir. 1993). The court of appeals noted some disagreement among courts whether *NLRB v. Bildisco & Bildisco* ought to be applied outside of the specific context in which that decision arose. But the decision in *Gerth* persuasively demonstrates why the Supreme Court's holding in *NLRB v. Bildisco & Bildisco* should govern in the context of setoff under Bankruptcy Code section 553. *See* 991 F.2d at 1436.

The Ninth Circuit Court of Appeals has not specifically addressed the impact of *Bildisco* on setoff. But the decision in *Gerth* is consistent with the trend in Ninth Circuit decisions, which have reaffirmed *Bildisco's* rejection of the separate entity theory in a variety of contexts. *See, e.g., Biltmore Assocs., LLC v. Twin City Fire Ins. Co.,* 572 F.3d 663, 671-72 (9th Cir. 2009) (debtor and debtor in possession act in the same capacity for purposes of applying "insured versus insured exception" under directors and officers liability insurance policy); *In re DiSalvo*, 219 F.3d 1035 (9th Cir. 2000) (debtor and debtor in possession were the same entity for purposes of applying claim preclusion); *In re Teerlink Ranch Ltd.*, 886 F.2d 1233 (9th Cir. 1989) ("TRL as debtor in possession paying the debt of TRL incurred prior to bankruptcy does not put itself in the position of one who pays another's debt and thereby gets an assignment of the debt he paid. TRL is still the same old debtor satisfying the same old debt").

The *Gordon Selway* case is further unavailing because there ultimately was "no mutuality problem in [that] case." *In re Gordon Sel-Way, Inc.*, 270 F.3d at 291. The Sixth Circuit Court of Appeals noted that the debtor against which the government held a tax claim was the same entity entitled to overpayment credit. *Id.* The underlying debt to the IRS was incurred by the debtor prepetition. Although the overpayment obligation of the IRS arose postpetition, the Court noted that it arose after confirmation of the chapter 11 plan, when the debtor in possession had ceased to

17

exist.  Thus, the underlying claim was owed by, and the overpayment obligation owed to, the same entity.

Here, the debtor in possession is likewise uninvolved.  The underlying tax claim of the IRS and the ERC obligations of the IRS both arose prepetition, before Debtor became a debtor in possession.  Moreover, although not determinative of when the ERCs arose, see Section III.A.2 above, the Court notes that Debtor did not even apply for the ERCs until after confirmation of its plan, when it ceased to be a debtor in possession.  Thus, nothing about the decision in *In re Gordon Sel-Way, Inc.* supports Debtor's contention that the IRS claims and the ERCs are not mutual debts, "in the same right and between the same parties, standing in the same capacity."[9]

Accordingly, the Court concludes the IRS' claims against Debtor for unpaid taxes, and the IRS' obligations to Debtor for the ERCs, are mutual debts for purposes of Bankruptcy Code section 553.

**B. The IRS Did Not Waive Its Rights of Setoff.**

Debtor argues that the IRS setoffs were barred on the grounds of waiver.  ECF No. 610 at 16-17.  Under Bankruptcy Code section 506(a), a "secured claim" includes an allowed claim of a

---

[9] *In re Gordon Sel-Way, Inc.* dealt with an unusual set of circumstances that are not presented here. In that case, the debtor's confirmed plan provided for payment of a 20% dividend to the holders of allowed nonpriority unsecured claims.  The debtor distributed all available funds to the holders of those claims *except* the IRS.  The debtor sought to subordinate the IRS' claim but did not reserve funds to provide the IRS a distribution if the subordination effort was not successful.  Ultimately, it was not.  Meantime, there were unpaid administrative expenses under the plan.  If the IRS refunded the overpayment as requested, the money would have been used to pay administrative expenses and would not be redistributed as a dividend on the IRS' nonpriority unsecured claim.  Under these unusual circumstances, and relying heavily on equitable principles, the Sixth Circuit Court of Appeals held that the IRS' claim—which first arose before the petition date—was transformed into a postpetition claim by the debtor's failure to reserve funds for the payment of the claim under the plan.  On this basis, the court of appeals allowed setoff of the IRS' claim against the debtor's postpetition overpayment, to the extent of the pro-rata distribution to which the IRS would have been entitled under the plan.  *In re Gordon Selway,* 270 F.3d at 291-292.  These unusual circumstances, and the court's unusual analysis, had nothing to do with mutuality.  *Id.* at 291 ("there is no mutuality problem in this case").  Moreover, to the extent *In re Gordon Sel-Way* limited the IRS' right of setoff to the post-confirmation, post-discharge value of the IRS' claim under the plan, the decision is inconsistent with Ninth Circuit law.  *See In re De Laurentiis Ent. Grp. Inc.*, 963 F.2d 1269, 1275- 76 (9th Cir. 1992) (right of setoff under section 553 takes precedence over the chapter 11 discharge under section 1141).

1  creditor "that is subject to setoff under section 553 of this title. . . to the extent of the amount

2  subject to setoff." 11 U.S.C. § 506(a). Debtor contends that the IRS waived its right to setoff of

3  the ERCs against its prepetition claims by "failing to timely assert a secured claim and by failing to

4  object to the Plan's treatment of the IRS' claim as an unsecured claim." ECF No. 610 at 16-17. In

5  support of this argument, Debtor principally relies on *In re Continental Airlines*, 134 F.3d 536 (3d

6  Cir. 1998), as amended (Mar. 23, 1998), in which the court found a waiver of a government entity's

7  right of setoff. *Id.* at 537-38.

8       As a general matter, "[w]aiver is the voluntary relinquishment of a known right or conduct

9  such as to warrant an inference to that effect. It implies knowledge of all material facts and of one's

10 rights, together with a willingness to refrain from enforcing those rights." *Hauk v. JP Morgan*

11 *Chase Bank USA*, 552 F.3d 1114, 1119 (9th Cir. 2009); *In re Verity Health Sys. of Calif., Inc.*, 598

12 B.R. 283, 289 (Bankr. C.D. Cal. 2018). Waiver also occurs when a "party's acts are so inconsistent

13 with an intent to enforce the right as to induce a reasonable belief that such right has been

14 relinquished." *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 938 (9th Cir. 2017); *In re Verity*

15 *Health Sys. of Calif, Inc.*, 598 B.R. at 289. The facts presented do not satisfy these legal standards.

16      The IRS first filed its proof of claim in Debtor's case on May 26, 2021. Claims Dkt. 2-1

17 (May 28, 2021). Prior to confirmation of the Plan on October 22, 2021, the IRS amended its proof

18 of claim three times. Claims Dkt. 2-2 (May 28, 2021), 2-3 (August 13, 2021), 2-4 (September 7,

19 2021). Each of the proofs of claim filed before confirmation of the Plan asserted various priority

20 and nonpriority unsecured claims against Debtor. Each also contained an express reservation of

21 rights to assert setoff against those claims:

22           The United States has the right of setoff or counterclaim. However,
             this determination is based on available data and is not intended to
23           waive any right to setoff against this claim debts owed to this debtor
             by this or any other federal agency. All rights of setoff are preserved
24           and will be asserted to the extent lawful
25

26 Claims Dkt. 2-4 at 4.

27      Meantime, the Plan does not mention the "Internal Revenue Service" or "setoff" anywhere,

28 let alone express an intent to abrogate, condition or alter the IRS' setoff rights against Joint Debtors.

1    *See* ECF No. 211.  Rather, the Plan provides generally for the treatment of all "priority tax claims,"

2    see *id.* at 5 (Section 3.03), all "secured tax claims to the extent allowed as a secured claim under

3    § 506 of the Code" see *id.* (Section 4.01, Class 2), and all "general unsecured claims."  *See id.* at 6

4    (Section 4.0, Class 3C).

5         The Court concludes that there has been no waiver by the IRS of its setoff rights.  The IRS

6    repeatedly asserted its right to setoff in the proofs of claim it filed prior to confirmation of the Plan.

7    The Plan itself contains no language that would put the IRS on notice of any intent by the Joint

8    Debtor to impair or abrogate its rights of setoff.  Indeed, as noted, the Plan provides treatment for

9    "secured tax claims."  ECF No. 211 at 4 (Section 2.02); 5 (Section 4.01, Class 2).  Secured claim

10   include those secured by a right of setoff.  *See* 11 U.S.C. § 506(a).  Thus, the IRS could reasonably

11   have concluded that the Plan provided treatment for any and all of its claims that were or became

12   "secured" by a right of setoff.  Based on these facts, the IRS' failure to object to confirmation of the

13   Plan does not evidence a "willingness to refrain from enforcing those rights" or "acts [that] are so

14   inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has

15   been relinquished." [10]

16        Debtor urges this Court to reach a different conclusion based on *In re Continental Airlines*,

17   134 F.3d 536.  In that case, the Third Circuit Court of Appeals denied a setoff by the General

18   Services Administration (the "GSA") in a chapter 11 case for the former well-known airline.  The

19   court concluded that GSA had waived its setoff right by not diligently asserting that right in the

20   chapter 11 case.  Specifically, GSA did not file a proof of claim asserting its right to setoff until

21   three years *after* confirmation of the debtor's chapter 11 plan.  *Id.* at 537-38.  That plan, moreover,

22

23

24   _____

25   [10] The Court acknowledges that the IRS reservation of rights language in its proofs of claim is
     generic, *i.e.*, it does not specifically identify the ERCs as a source of setoff rights or the amount.
26   But the Court finds the language adequate to the task.  In the field of tax administration, the
     specific facts giving rise to a setoff right may not be known at the time a proof of claim is filed, or
27   as here, at the time a plan is confirmed.  Here, Debtor did not apply for the ERCs until months after
     confirmation of its chapter 11 plan.  The Plan does not address the ERCs or any potential rights of
28   setoff by the IRS—but could have done so, using similarly general but express language.

1    treated the GSA's claim as an unsecured claim, *i.e.*, not as a claim secured by a right of offset under

2    section 506(a).  *Id.* at 538.

3         In reaching these conclusions, the court in *In re Continental Airlines* followed its own

4    precedent in *United States v. Norton*, 717 F.2d 767 (3d Cir. 1983).  In *Norton*, a chapter 13 case,

5    the court held that the IRS' withholding of an overpayment violated the automatic stay and adopted

6    the view that setoff is not permitted after confirmation of a plan.  *See In re Continental Airlines*,

7    134 F.3d at 539 (discussing *Norton*).  In *Norton,* the court concluded that withholding the

8    overpayment was improper because the IRS' setoff rights did not survive confirmation of the

9    chapter 13 plan.  *Id.* at 771-774.  The court observed (i) the plan provided for payment in full of the

10   IRS' claim, (ii) unless otherwise provided under the plan, property of the estate revests in the debtor

11   free and clear of claims and interests of creditors provided for under the plan (citing 11 U.S.C.

12   § 1327), (iii) the IRS had not objected to the Plan, and (iv) the debtors had been "faithful to their

13   obligations under the plan."  *Id.* at 774.   The court concluded that permitting the IRS to retain the

14   overpayment under these circumstances would be unfair to the debtors and undermine the

15   rehabilitative goals of the Bankruptcy Code.  *Id.*

16        Neither of these Third Circuit decisions is persuasive.  The facts of *In re Continental

17   Airlines, Inc.* are entirely distinguishable from the facts presented here.  In that case, the creditor

18   did not file a claim asserting a right of offset until three years after plan confirmation.  Here, the

19   IRS did so early and repeatedly prior to confirmation of the Plan.  Further, in *In re Continental

20   Airlines, Inc.*, the plan treated the creditor as holding an exclusively unsecured claim.  Here, the

21   Plan expressly provides for secured tax claims (which include tax claims secured by a right to

22   setoff) and provides treatment for those claims.  This negates any inference that failure to object to

23   the Plan was a waiver of the IRS' setoff rights.

24        Moreover, to the extent *In re Continental Airlines, Inc.* and *Norton* stand for the proposition

25   that a right to setoff is waived upon plan confirmation unless expressly preserved in a plan, they are

26   inconsistent with the Ninth Circuit law.  Pursuant to the text of Bankruptcy Code section 553,

27   rights of setoff are preserved as against all other provisions of the Bankruptcy Code, with limited

28   exceptions.  *See* 11 U.S.C. § 553(a) ("Except as otherwise provided in this section and in sections

362 and 363 of this title, *this title does not affect any right* of a creditor to offset a mutual debt. . . "). Applying this language, the Ninth Circuit Court of Appeals held in *In re De Laurentiis Ent. Group, Inc.*, 963 F.2d 1269, 1274-77 (9th Cir. 1992) [hereinafter *De Laurentiis*] that rights of setoff under section 553 take precedence over section 1141, the statute that gives effect to a confirmed chapter 11 plan. *Id.*

In *Norton*, the court effectively held that the plan's promise to pay a priority unsecured tax claim in full, as required by Bankruptcy section 1322(a)(2), and the automatic vesting of property of the estate free and clear of claims and interests following plan confirmation, as provided by section 1327, are adequate to deprive the creditor its right to setoff. [11] In *In re Continental Airlines,* the court effectively held that confirmation of the plan under section 1129 and implementation of the plan under section 1141 were likewise adequate to deprive a creditor's setoff right. In reaching these conclusions, the Third Circuit exalted other provisions of the Bankruptcy Code over section 553, which is precisely what the Ninth Circuit decision in *De Laurentiis* compels this Court to avoid. [12]

Accordingly, the Court concludes that the IRS did not waive its setoff rights with respect to the ERCs.[13]

## C. The IRS' Setoffs Did Not Violate the Plan and Are Not Precluded by the Doctrine of *Res Judicata.*

Debtor argues that the IRS setoffs of the Q1-21 ERC and the prepetition portion of Q2-21 ERC were improper because they violated the Plan. Specifically, Debtor contends that the Plan

---

[11] Although different in various ways, Bankruptcy Code section 1327 serves some of the same functions in chapter 13 that section 1141 serves in chapter 11.

[12] In support of its waiver argument, Debtor also cites *In re Beck*, No. BAP NC-15-1095-JUKUW, 2016 WL 399455 (B.A.P. 9th Cir. Feb. 1, 2016). *In re Beck* does not address waiver, but instead the doctrine of *res judicata.* That issue, and the case, are addressed in Section III.C. below.

[13] Debtor's papers style its argument as one of "waiver and estoppel" but make no effort to identify which theory of estoppel or provide the legal standards applicable to that theory. *See* ECF No. 610 at 16-17. Rather than speculate, the Court has limited its discussion above to the one theory for which Debtor offered authority: waiver.

1    directed the IRS to offset the ERCs against its prepetition claims in a specific order, until each type

2    of claim was exhausted: first to priority trust fund tax claims; second to priority claims other than

3    trust fund tax claims; and third to nonpriority claims.  Debtor further argues that the IRS did not

4    object to the Plan and that the Plan is now *res judicata* on the issue of setoff of the ERCs.   The IRS

5    disagrees.

6          As a preliminary matter, the parties disagree on whether a plan may properly condition a

7    creditor's exercise of its setoff rights.  Both sides acknowledge *United States v. Energy Resources*

8    *Co., Inc.*, 495 U.S. 545 (1990) [hereinafter *Energy Resources*], in which the Supreme Court held, in

9    consolidated appeals from plan confirmation orders, "a bankruptcy court has the authority to order

10   the Internal Revenue Service (IRS) to treat tax payments made by Chapter 11 debtor corporations

11   as trust fund payments where the bankruptcy court determines that this designation is necessary for

12   the success of a reorganization plan." *Id.* at 548-49.  The Supreme Court reached this conclusion

13   notwithstanding IRS regulations that otherwise permit the IRS to make the determination of how to

14   apply payments remitted by the taxpayer, depending on the circumstances.  *Id*. at 548; *see also*

15   *Internal Revenue Service v. Creditors Committee (In re Deer Park, Inc.)*, 10 F.3d 1478, 1481-1484

16   (9th Cir. 1993) (applying *Energy Resources* holding to a liquidating plan).

17         But *Energy Resources* did not address whether a chapter 11 plan may prescribe the way

18   *setoff* rights are exercised.  And the IRS argues that setoff is different.  As noted above, rights of

19   setoff are preserved as against all other provisions of the Bankruptcy Code, with some limited

20   exceptions.  *See* 11 U.S.C. § 553(a).  Among other provisions, section 553 takes precedence over

21   section 1141, which binds all creditors to the plan, effectuates its implementation, and discharges

22   claims against the debtor.   In *De Laurentiis*, a reorganized debtor challenged a creditor's setoff of

23   mutual prepetition debts on the ground that the creditor's claim against the debtor was discharged

24   under the confirmed plan, pursuant to section 1141(d).  The court of appeals rejected this argument,

25   concluding that section 553 would be rendered meaningless if the right of setoff did not survive

26   confirmation of a plan and the discharge of claims thereunder.  *See De Laurentiis,* 963 F.2d at

27   1274-77   The *De Laurentiis* decision does not address whether a plan may expressly alter or

28

1  condition a creditor's right of setoff, but it does raise questions about whether doing so is consistent

2  with the Bankruptcy Code.

3      Here, the Court need not decide the issue.  The Court is not being asked to opine on whether

4  to confirm a chapter 11 plan that purports to alter or condition a creditor's setoff rights.  The Plan

5  has long since been confirmed.  The Court is being asked whether the IRS' setoffs violated any

6  terms of the Plan, or whether the IRS is otherwise precluded from asserting its setoff rights because

7  the Plan is now "res judicata."

8              **1.  Whether the Plan Prohibited the Setoffs**

9      A confirmed chapter 11 plan "is essentially a contract between the debtor and his creditors,

10 and must be interpreted according to the rules governing the interpretation of contracts." *Miller v.*

11 *U.S.,* 363 F.3d 999, 1004 (2004) (citing *Hillis Motors, Inc. v. Haw. Auto. Dealers Ass'n,* 997 F.2d

12 581, 588 (9th Cir.1993)).  The federal rule of decision for construing contract terms in chapter 11

13 plans is to rely on state law where, as here, there is no need for a uniform federal rule on the

14 question. *In re Hillis Motors*, 997 F.2d at 588; *see also Dragnea v. Dragnea (In re Dragnea),* 609

15 B.R. 239, 250-51(Bankr. E.D. Cal. 2019).  California law is applicable here, by the express terms

16 of the Plan.[14]

17     Under California law, the intent of a contract "is to be inferred, if possible, solely from the

18 written provisions of the contract, . . . 'if the language is clear and explicit, and does not involve an

19 absurdity,' Cal. Civ. Code § 1638." *Schertzer v. Bank of Am., N.A.*, 109 F.4th 1200, 1208 (9th Cir.

20 2024) (citation omitted).  "[T]erms must be 'understood in their ordinary and popular sense rather

21 than according to their strict legal meaning; unless used by the parties in a technical sense, or

22

23 ────────────────

   [14]  Section 6.08 of the Plan provides:

24

25          Unless a rule of law or procedure is supplied by federal law (including the
            Code or the Federal Rules of Bankruptcy Procedure), the laws of the State
26          of California govern this Plan and any agreements, documents, and
            instruments executed in connection with this Plan, except as otherwise
27          provided in this Plan.

28 ECF No. 211 at 8.

unless a special meaning is given to them by usage.' Cal. Civ. Code § 1644." *Id.* The "'ordinary and popular' meaning of a term is 'the meaning a layperson would ascribe to [it].'" *Id.* (citation omitted).

However, a contractual term or provision may be ambiguous. This is true where it is "'capable of more than one reasonable interpretation.'" *Miller v. U.S.*, 363 F.3d at 1004 (citation omitted). Under California law, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.' Cal. Civ. Code § 1654." *Id.* at 1005. Thus, "[a]lthough confirmation of a [chapter 11] plan generally acts as a final order which binds all parties, regardless of whether they assented to the plan, a plan which is ambiguous as to a material term is subject to interpretation by a reviewing court" and may be construed against the drafter of the plan. *See Miller v. U.S.,* 363 F.3d at 1004.

Debtor asserted repeatedly in its pleadings and at oral argument that the IRS' setoffs violated the "distribution scheme" or "distribution waterfall" contained in the Plan. However, when pressed by the Court to identify which provisions of the Plan expressly conditioned the IRS' rights of setoff, Debtor could not do so. The only provision to which Debtor could point was the claims treatment section, which refers only to "payments" to be made under the Plan in satisfaction of those claims. *See, e.g.,* ECF No. 211 at 5 ("Each holder of a priority tax claim will be paid in full with required statutory interest of 3.25% per annum or such other interest required by law (commencing on the Petition Date) amortized over four (4) years and paid quarterly with such payments earmarked to first satisfy the trust fund portion of such allowed tax claims"); ECF No. 211 at 6 (Allowed general unsecured claims whose claims are not satisfied in Classes 3A-3B will receive a pro-rata share of Debtors' actual Disposable Net Income for the four (4) year period following the Effective Date of the Plan, to be paid annually after the claims of the other classes are first satisfied).

These provisions do not address the terms "setoff" or "offset." They do not refer to any rights under Bankruptcy Code section 553. They do not even refer to the related concepts of "credits," "refunds," or "defenses" to claims against Debtor. They refer only to the timing and amount of the "payments" Debtor is obligated to make under the Plan. The ordinary and popular

meaning of the term "payment" is to remit money. *See, e.g.,* Webster's II New College Dictionary at 807 (1995) (leading definition of "pay" is "to give money to in return for goods or services;" definition of "payment" is "the act of paying or the state of being paid"). Thus, the language that requires "payments" to be earmarked for the satisfaction of trust fund taxes before other priority claims is most naturally read to apply only to funds remitted by Debtor under the Plan—not the exercise of a right of setoff by the IRS or any other creditor. As discussed above, see Section III.A.3., setoff does not involve the payment of money but rather the netting of mutual obligations.

To the extent the exercise of a setoff right may arguably be viewed as an *effective* or *figurative* payment because it results in the discharge of an obligation, use of the term "payment" in the Plan is, at best, ambiguous. As such, the ambiguity must be construed against Debtor, which drafted the Plan. As noted above, Bankruptcy Code section 553 expressly confers precedence over most provisions of the Bankruptcy Code, including section 1141. If Debtor intended to alter, condition or affect the setoff rights of any party, it was incumbent on Debtor to draft a plan that did so explicitly and unequivocally. Accordingly, the IRS' setoffs with respect to Q1-21 and Q2-21 did not violate the Plan.

### 2. Whether *Res Judicata* Precludes the IRS From Challenging Whether the Plan Prohibits Setoff

Debtor argues that the Court's interpretation of the Plan is somehow barred by the doctrine of *res judicata*, also known as claims preclusion. This argument lacks merit. Although it is true that a confirmed chapter 11 plan is "binding on all parties and questions that could have been raised pertaining to the plan are entitled to *res judicata* effect," *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995), due process requires that "a confirmed plan will not preclude parties from subsequently asserting their rights unless specific language in the plan **clearly** and **unambiguously** disposed of those rights." *Solimano Framing Group LLC v. Pier Constr. & Dev., LLC (In re Solimano Framing Group, LLC)*, 664 B.R. 803, 813 (B.A.P. 9th Cir. 2024) (emphasis in original).

In *In re Solimano Framing Group, LLC,* the debtor confirmed a plan that purported to assume a list of executory contracts with zero cure costs. Two of the contracts on the list had been

terminated prepetition and were ineligible for assumption.  When the counterparty under those

contracts filed claims for termination damages, the debtor argued that assumption of those contracts

under the confirmed plan barred the landlord from asserting those claims.  The BAP disagreed.

The BAP found that the application of claims preclusion under those circumstances would violate

the counterparty's due process rights because the plan: (i) did not disclose that any of the contracts

the debtor intended to assume had been terminated prepetition and (ii) did not clearly indicate that

the rights of the counterparty to file a claim would be affected by the plan's contract assumption

provisions.  *Id.* at 811-14

Consistent with *In re Solimano Framing Group, LLC*, the Ninth Circuit Court of Appeals

repeatedly has emphasized that claim preclusion does not apply where the language impacting a

party's rights is not clear and unambiguous.  *See Miller*, 363 F.3d at 1006 (language in chapter 11

plan providing for discharge of nondischargeable debts was "insufficiently clear to warrant

overriding the interpretive rule that statutory rights can be waived only by an explicit statement");

*Enewally v. Wash. Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1173 (9th Cir. 2004) (holding

"confirmed plan has no preclusive effect on issues that ... were not sufficiently evidenced in a plan

to provide adequate notice to the creditor" and a contrary holding would allow stripping of rights

"by ambush"); *Brady v. Andrew (In re Com. W. Fin. Corp.)*, 761 F.2d 1329, 1337 (9th Cir. 1985)

(notice inadequate where disclosure statement included substantive arguments regarding ability to

avoid investors' interests, but statement did not clearly warn investors that by voting for the plan

they would relinquish their security interests).

Here, *res judicata* does not preclude the IRS from exercising its setoff rights in the manner

it did.  As discussed above, the plan language earmarking "payments" to be made under the Plan is

inadequate to abrogate, condition or alter the IRS' setoff rights.  Likewise, for purposes of *res

judicata*, it is inadequate to put the IRS or any other creditor on notice that its setoff rights *might* in

any way be affected by the Plan.  Indeed, nothing in the Plan provides such notice.  Accordingly,

1  confirmation of the Plan did not preclude the IRS' setoffs, its opposition to the Motions, or the

2  Court's interpretation of the Plan.[15]

3      Debtor offers a cavalcade of case authorities, but none compel a different result.  *See* ECF

4  No. 610 at 8-10; 615 at 7-13.  As noted, *Energy Resources,* 495 U.S. at 548-49, and *In re Deer*

5  *Park, Inc.*, 10 F.3d at 1481-1484, dealt with whether a court can approve plan provisions

6  prescribing the way the IRS must apply payments made by a debtor under a plan.  These cases did

7  not involve setoff rights under section 553 or the interpretation of language in a confirmed chapter

8  11 plan purporting to alter those rights.  They are not controlling here.

9      In the chapter 13 case of *In re Moore*, 200 B.R. 687 (Bankr. D. Or. 1996), the Court

10  conditioned relief from stay to the IRS, requiring it to exercise setoff of an overpayment first

11  against the IRS' nonpriority claim, and second against the IRS' priority claim.  The debtors argued

12  that their chapter 13 plan would become infeasible if the IRS were not required to exercise its

13  setoff right in this manner.  The court sided with the debtors, citing its equitable powers under

14  Bankruptcy Code section 105(a) and the permissive nature of setoff.  It also purported to rely on

15  ────────────────

16  [15] Debtor attempts to suggest that setoff is somehow precluded because "[t]he feasibility of the
Plan [*i.e.,* as determined at plan confirmation] was dependent in large part upon the priority tax
17  claims being limited to approximately $5.2 million." ECF No. 601 at 10:10-11 & n. 4 (citing
feasibility analysis at ECF No. 340 at 42).  This argument is unpersuasive for numerous reasons.
18  First, Debtor points to no testimony in the record substantiating this argument.  Debtor does
identify a chart submitted in support of confirmation showing anticipated distributions to the
19  holders of priority and secured tax claims ranging from $5.1 million to $5.2 million, but there is no
explanation as to what those amounts include.  ECF No. 340 at 42.  Second, Debtor fails to explain
20  how the numbers on the referenced chart have anything to do with setoff.  To the contrary, the way
the argument is posited suggests that Debtor may have underestimated its total tax liability to the
21  IRS.  If the total tax liability were ultimately less, perhaps a greater portion of the ERCs would
have been available as a refund.  But none of this was discussed or litigated at plan confirmation.
22  That Debtor may have underestimated its tax liability is unfortunate, but not a basis in hindsight to
deprive the IRS of its setoff rights.  Third, Debtor fails to explain why, if the Plan depended on IRS
23  claims in an amount of no more than $5.2 million, it did nothing about the third amended proof of
claim filed by the IRS weeks before the hearing on confirmation of the Plan, which asserted in
24  excess of $7.2 million in aggregate claims.  Debtor did not raise the issue at confirmation or object
to the claim prior to proceeding with confirmation.  Fourth, the Court was not asked and made no
25  findings—express or implied—regarding the amount of the IRS' claims, its rights of setoff, or the
impact of either on confirmation of the Plan.  For these reasons, the referenced chart was wholly
26  inadequate to put the IRS on notice that its setoff rights might be affected by confirmation of the
Plan.
27

28

*Energy Resources* and *In re Deer Park, Inc.*, but its analysis of these cases was cursory and unpersuasive. The court in *In re Moore* failed to consider that those appeals were from plan confirmation orders, did not involve rights of setoff, and did not require those courts to consider the adequacy of language purportedly modifying such rights. The Court does not find *In re Moore* persuasive.

Debtor cites *In re Applied Logic Corp.*, in which the Second Circuit Court of Appeals permitted a bank to exercise its rights of setoff, because the opinion distinguishes an old Ninth Circuit opinion that reached the contrary result. *See* ECF No. 615 at 11; *In re Applied Logic Corp.*, 576 F.2d 952, 959-60 (2d Cir. 1983) (citing *First Nat. Bank of Portland v. Dudley*, 231 F.2d 396, 402 (9th Cir. 1956)). In *Dudley*, the court affirmed the referee's conclusion that a bank had waived its right to setoff under an agreement with the debtor and its trade creditors to accept a pro rata share of the proceeds of the debtor's inventory in satisfaction of its claim. 231 F.2d at 402. The court observed that the bank had not expressly reserved a right to setoff under the agreement and that recognizing such a right would be at odds with the parties' sharing agreement. *Id.* But *Dudley* was decided under the former Bankruptcy Act. It does not address the language of Bankruptcy Code section 553, the interpretation of a plan confirmed under chapter 11 of the Bankruptcy Code, or the modern Ninth Circuit case law requiring relinquishment of a creditor's rights under a plan to be explicit and unambiguous.[16] Additionally, unlike the bank in *Dudley*, the IRS expressly asserted its setoff rights in multiple proofs of claim. The Court concludes, therefore, that *Dudley* does not control here.

Debtor cites *Trulis v. Barton*, 107 F.3d 685, for its legal standard on *res judicata* (quoted above), but application of the standard under the circumstances presented there is distinguishable. There, a confirmed chapter 11 plan provided that creditors electing certain treatment under the plan

---

[16] It is not clear why Debtor cited *In re Applied Logic Corp.*, rather than directly citing *Dudley*. Perhaps it is because *Applied Logic Corp.* was decided in 1983, which is relatively more recent. The Court notes, however, that *In re Applied Logic Corp.* also was decided under the former Bankruptcy Act.

would be deemed to release any claims they held against certain third parties.  *Id.* at 691.  A creditor that made the election nevertheless sued parties that were released under the plan.  The Ninth Circuit Court of Appeals held that the release was binding on the creditor because he had failed to challenge the plan on direct appeal.  *Id.*  But the plan in that case contained express release provisions, which the creditor did not challenge.  Here, by contrast, the plan contains no provision impairing, or even mentioning, the IRS' setoff rights.

Debtor cites several unpublished BAP opinions, but the Court does not find them persuasive.  In *In re Beck*, No. BAP NC-15-1095-JUKUW, 2016 WL 399455 (B.A.P. 9th Cir. Feb. 1, 2016), the BAP held that due process was adequate to strip a lender's second position lien where the valuation motion served on the lender properly identified the lender, its second position lien, the loan number and loan amount, but misidentified the deed of trust.  The court's conclusion was corroborated by the fact that the lender also had been served with a chapter 13 plan showing the lender's claim would be treated as unsecured and receive no distribution.  The case is inapposite.  The motion in *Beck* disclosed an express intent to strip the lender's lien.  The Plan here discloses no intent to abrogate or condition the IRS' setoff rights.

In *In re AB Liquidation Corp.*, No. ADV. 05-05553-ASW, 2006 WL 6810956 (B.A.P. 9th Cir. Dec. 22, 2006), the BAP held that a landlord was not permitted to collect that portion of its claim that was disallowed under Bankruptcy Code section 502(b)(6) on the ground that the chapter 11 plan was a liquidating plan under which no discharge was granted.  The BAP found that the entitlement of creditors to payment from the debtor nevertheless was limited by the plan's distribution and injunction provisions.  The BAP emphasized that these provisions were preclusive.  But again, the analogy is inapt.  In *In re AB Liquidation Corp.*, the BAP identified express provisions of the plan abrogating the landlord's rights.  Here, there is no such language in the Plan abrogating the rights of the IRS.

Likewise, none of the out-of-circuit cases cited by Debtor are helpful.  The Third Circuit decisions of *In re Continental Airlines* and *In re Norton*, discussed above in Section III.B, are really waiver cases rather res judicata cases.  More importantly, these cases conflict with the Ninth Circuit decision in *De Laurentiis,* which holds that confirmation of a plan, and the discharge of

claims thereunder pursuant to Bankruptcy Code section 1141, must yield to the right of setoff recognized under section 553.  *See De Laurentiis*, 963 F.2d at 1274-77.  Similarly, the decision in *In re Gordon Selway, Inc.*, 239 B.R. 741 also is at odds with *De Laurentiis,* to the extent the former limited the creditors' setoff rights to the amount not discharged under the debtor's chapter 11 plan. In *In re Davis,* 661 B.R. 655 (Bankr. D.N.M. 2024) the court held that the government had waived its setoff rights by filing an unsecured claim and acquiescing to treatment of its claim as an unsecured claim under the plan.  *Id.* at 671-75.  Here, the IRS timely filed multiple proofs of claim asserting its setoff rights and none of the language in the Plan expressly or impliedly modified those rights.

**D.  The Setoffs Should Not Be Unwound On Equitable Grounds.**

Finally, Debtor argues that that unless the IRS is ordered to reapply the setoff and refund $1.4 million "the Debtors may not be able to continue to make its plan payments and fulfil its obligations to the general unsecured creditors."  ECF No. 601 at 17:17-21.  According to the President and Chief Executive Officer of Debtor:

> The Debtors have been facing significant headwinds due to the lingering effects of the Covid-19 pandemic. Many office workers have failed to return to work, turning once thriving business centers into deserted locations. As a consequence, the Debtors have been forced to close a number of its locations due to the fact that business has not rebounded. The loss in locations and corresponding losses in revenues have dragged down the Debtors' financial performance. That is why the Debtors are dependent upon the full amount of its earned ERTC in order to continue its operations and complete all plan payments. Unless the IRS is ordered to apply the over $1.4 million in setoffs against the trust fund portion and then the non-trust priority portion of the IRS' claim (in conformity with the priority scheme set forth in the Plan), the Debtors may not be able to continue to make its plan payments and fulfil its obligations to the general unsecured creditors.

ECF No. 601-1 at 3:8-18 (Declaration of Claude Cognian).  The Court construes this as an argument that the Court should unwind the setoff on equitable grounds.  *See Newbery Corp. v. Fireman's Fund Ins. Co.,* 95 F.3d at 1399 ("The right of setoff is permissive, not mandatory; its

application 'rests in the discretion of [the] court, which exercises such discretion under the general principles of [equity].'") (citation omitted).

That Joint Debtors are continuing to experience financial distress postconfirmation is unfortunate.  Chapter 11 exists to assist debtors in achieving financial rehabilitation.  But the financial needs of Joint Debtors cannot be the Court's only consideration in whether equitable grounds exist to unwind the IRS' setoff—particularly where the Court has long since confirmed the Plan.  As discussed above, the IRS did not violate the confirmed Plan or waive its setoff rights.  The IRS repeatedly asserted its right to setoff in its proofs of claim prior to confirmation, and the Plan (and Confirmation Order) contain no provision abrogating, limiting or conditioning the IRS' right to setoff.  Although Joint Debtors' financial condition may be the result of circumstances beyond its control, it *could* have addressed the setoff question prior to confirmation.  While the Court will not speculate whether it would have confirmed a plan that altered the IRS' setoff rights, Debtor was in a position—back in 2021—to propose a plan that expressly addressed those rights.  Doing so would have put the IRS on notice that Debtor sought to limit or condition those rights, and the matter could have been litigated prior to a determination on the Plan.  The third amended proof of claim, which asserted over $7.2 million in total tax liability and reserved the IRS' setoff rights was on file weeks before the hearing on confirmation of the Plan.  If, as Debtor attempts to suggest, the Plan was somehow dependent on a lower total tax liability and/or setoff-related relief, the time to address that was *prior* to confirmation of the Plan.  If a plan addressing these issues could not be confirmed, perhaps an alternative plan could have been considered.  But that is not what happened.  Under these circumstances, the Court concludes that the equities do not favor unwinding the setoff lawfully exercised by the IRS.

///
///
///
///
///
///

1

**V.**

2

**CONCLUSION**

3

Based on the foregoing, the Motions will be **DENIED** pursuant to separate orders of the

4

Court.

5

# # #

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Date: March 31, 2025

_____
Martin R Barash
United States Bankruptcy Judge

24

25

26

27

28